JOHN H. HULSEY v. TOWER GROVE QUARRY & CONSTRUCTION COMPANY, Appellant.—30 S. W. (2d) 1018.

Division One, September 4, 1930.

*John T. Sluggett, Jr.,* and *R. C. Brinkman* for appellant.

*Mark D. Eagleton, E. M. J. Clark* and *Hensley, Allen & Marsalek* for respondent.

SEDDON, C.—Plaintiff (respondent here) commenced this action on January 5, 1926, to recover damages for personal injuries alleged to have been suffered by him on December 10, 1925, by reason of defendant's negligence, and while plaintiff was employed by defendant (appellant here) as a laborer in defendant's rock quarry in the city of St. Louis. A trial of the action to a jury resulted in a un-

animous verdict in favor of plaintiff in the sum of $15,000. The trial court ordered plaintiff to remit from the verdict the sum of $3,500, under penalty of sustaining defendant's motion for a new trial, and plaintiff complied with said order of the trial court by entering a *remittitur* for $3,500. Thereupon, judgment was entered in favor of plaintiff in the sum of $11,500, from which judgment defendant was allowed an appeal to this court.

The petition alleges, in substance, that defendant operated a rock quarry in the city of St. Louis; that on or about December 10, 1925, plaintiff was employed by defendant at said rock quarry, and, while plaintiff was engaged in his duties and was carrying and moving a large, heavy and unwieldy rock in and about the aforesaid quarry and through a narrow passageway or aisle therein, the floor of which passageway or aisle was covered with a wet, slick, slippery and slimy mixture of water, dirt, mud and other substances, and while plaintiff and another employee of defendant were directed and required to carry such large, heavy and unwieldy rock over and along said slick, slippery and dangerous floor, plaintiff was caused to slip and fall, and to suffer injury, as the direct and proximate result of defendant's negligence. The petition charges defendant with eight specific acts of negligence, but three of the eight assignments of negligence were withdrawn from the consideration of the jury by the instructions of the trial court. The five remaining assignments of negligence, as charged in the petition, are as follows:

"1. Defendant negligently failed to exercise due care to furnish and use a sufficient number of men to do said work with reasonable safety, when defendant knew, or by the exercise of due care could have known, that the number of men so engaged was insufficient to do said work with reasonable safety, and that it was dangerous and not reasonably safe.

"2. Defendant negligently caused and permitted the aforesaid mud, dirt and other substances to be and accumulate on the aforesaid flooring, and negligently caused and permitted said flooring to be and remain in its aforesaid wet, slick and slippery condition, which was not reasonably safe, although defendant knew, or by the exercise of due care could have known thereof, in time to have avoided injury to plaintiff.

"3. Defendant negligently failed to exercise due care to furnish and maintain for plaintiff a reasonably safe place in which to work, in that, by reason of the aforesaid conditions and circumstances, it was dangerous and not reasonably safe, all of which defendant knew, or by the exercise of due care could have known, in time to have avoided plaintiff's injury.

"4. Defendant negligently ordered, required and permitted plaintiff to do the aforesaid work in the aforesaid manner, and to carry the rock over the aforesaid slick, slippery and dangerous flooring,

without a sufficient number of workmen to do said work as aforesaid, and negligently assured plaintiff that he could do said work with reasonably safety to himself, although defendant knew, or by the exercise of due care could have known, that plaintiff, while so doing, was likely to be injured as aforesaid, and was in danger and not reasonably safe.

"5. Defendant negligently failed to exercise due care to remove the aforesaid wet, slick, slippery and slimy mixture of water and mud as aforesaid from the aforesaid quarry, when defendant, by the exercise of due care in so doing, could have thus and thereby have avoided injury to plaintiff."

The petition prayed judgment against defendant in the aggregate sum of $15,000.

The answer of defendant is a general denial of each and every allegation of the petition.

The evidence on plaintiff's behalf tended to show that plaintiff had been employed in defendant's quarry from August, 1925, to the day of his alleged injury, which occurred on December 10, 1925; that he was thirty-two or thirty-three years of age at the time of his injury, and, prior to his injury, he had been in good health, and had been a strong and able-bodied man; that defendant had paid plaintiff, for his services, a daily wage of $3.60; that plaintiff sometimes worked a full week of six days, and at other times worked only three or four days in a week, depending on prevailing weather conditions; that his work mainly consisted of carrying and loading building rock at the bottom of the quarry, the rock being loaded onto wooden boxes, which were lifted by a crane or derrick to the top of the quarry; and that plaintiff's place of work was a narrow passageway or aisle, between the sides of the quarry, some ten to fifteen feet in width.

The evidence for plaintiff further tended to show that at about 10:30 or eleven o'clock on the morning of December 10, 1925, plaintiff and one Bensone Dalton, another employee of defendant, were engaged in carrying a large and heavy rock, weighing approximately 320 pounds, from a pile of rock, at the bottom of the quarry, to a wooden box some ten or fifteen feet distant from the pile of rock, where two other employees of defendant were engaged in loading the wooden box. Plaintiff testified that the floor of the narrow passageway or aisle, along and through which he and Dalton were carrying the heavy rock, was covered with a mixture of mud and water, about two or three inches in thickness; that the floor of the passageway had been flooded as a result of recent rains; and that the passageway or aisle "was awfully slick" underfoot. Plaintiff was walking backward, and Dalton was walking forward, each holding in his hands one side or end of the heavy rock. Respecting the manner and occurrence of his injury, plaintiff testified as follows:

"Q. And where were you at the time you were injured? A. Down at the bottom of the quarry. Q. And what were you doing when you were injured? A. Loading building rock. . . . Q. How big was it? A. To the best of my knowledge, about three hundred and twenty pounds. Q. Had you had experience in handling similar kind of rock before that? A. No, sir. Q. I mean before that day you had? A. Yes, sir. Q. You say Forschee was your foreman? A. Yes, sir. Q. And where were you taking the rock from, and where to? A. We were carrying the rocks from the pile over on the track. Two fellows were putting them in a box, and we were carrying the rocks to them. Q. How far did you have to carry the rocks? A. Well, about ten feet, or something like that. Q. And what would you walk on, this ten feet that you would have to travel in moving the rock? A. Well, we were walking on rock bottom and mud. Q. How thick was the mud on this day? A. I judge it to be about two or three inches thick. Q. And what was its condition, with reference to whether or not it was wet and slippery? A. Well, the water had been on there, and it was awfully slick on your foot. Q. What happened while you were moving this particular rock that, you say, weighed about three hundred pounds? A. Well, me and the fellow that was working with me was carrying the rocks and putting them in a box, and we picked this rock up and started backwards, and I was in such a strain from the rock that my foot slipped and threw me backwards, and I fell on some rocks. Q. And when you fell against those rocks, what happened to the rock you were carrying? A. The rock fell on my stomach. Q. Fell on you? A. Yes, sir. Q. You say you were strained? A. Yes, sir. Q. What was causing the strain? A. The rock . . . Q. How many men ordinarily were used in that class of work? A. Well, sometimes three, and sometimes four, on a rock. Q. And when three or four men were used in carrying that size of rock, would it be with the place wet, as this was, and with dirt on it, or would that be in a dry place? A. It would be in a wet place. Q. Similar to this place? A. Yes, sir. Q. How did the weight of this rock on this particular occasion affect you, in so far as the carrying of it was concerned? A. It was slick and muddy there. Q. I say, how did it affect you? While you were carrying this rock, just at the time you were injured, what feeling did you have as to its weight and its size? A. Well, I was in a strained condition. I was in such a strain I could hardly walk with the rock. Q. About this mud and dirt accumulation on the floor there, had you made any suggestion or complaint to the foreman about it? A. Yes, sir. Q. Whom had you spoken to? A. Mr. Forschee. Q. And what had you told him about it? What had you said about it? A. I told Forschee that them rocks was too heavy to carry, in a place like that, for two men. Q. And what did he say about it? A.

He said, 'Go ahead and pack them rocks. There ain't no danger.' I asked him, 'Why not shovel out that mud in there so a man can get through there?' And he said, 'Go ahead and get those rocks out. We have to have those rocks out of there.' Q. And when was that with reference to the time when you got hurt? How long before? A. Well, it was about five minutes, I guess, or something like that.''

Cross-examination: ''Q. Had you worked in any quarry before August, 1925? A. No, sir. Q. That is the first quarry you worked in? A. Yes, sir. Q. And that is the only quarry you have worked in? A. Yes, sir. . . . Q. Now, you went to work in August, 1925, for the Tower Grove Quarry Company, in what capacity? A. Well, just laboring work. Q. As a laborer? A. Yes, sir. Q. And you worked there from that time up until December—in the quarry? A. Yes, sir. Q. Now, how many days a week, on an average, did you work there? A. Well, some weeks we would get in three and four (days), and sometimes a full week. Just according to the weather. Q. According to the weather? A. Yes, sir. Q. And it was also according to the work—whether you had caught up with your work and gotten enough rock piled up, or the bins filled up? A. No, sir. Q. You were never laid off on account of slack work? A. No, sir. Q. How many working days do you say you weren't working from the time you started in August until December? A. Well, I don't know exactly. Sometimes we would work three and four days, and sometimes we wouldn't get over one or two (days). Q. I know, but how often would you work six days a week? A. It is according to the weather, is all I know. THE COURT: Well, how often was the weather good enough for you to work six days a week? A. We were getting lots of rain. Q. Do you remember? A. No, sir; I don't remember. Q. So you don't know what your average weekly income was while you were working for the Tower Grove Quarry Company? A. No, sir, I don't. Q. Now, during the time that you worked for the Tower Grove Quarry Company, what was the greatest number of men that were working down in the bottom of that quarry with you? A. Sometimes twelve, and sometimes there were fifteen. Q. Fifteen was the highest number? A. Something like that. Q. And the smallest number was twelve? A. No, sir; some days we didn't have that many. Q. Well, what was the smallest number? A. The day I got hurt there was only about seven or eight men down there. There were four (men) working there where I was working. Q. There were four? A. Yes, sir. Q. And who were they? A. Ben Dalton was one of the men, and myself, and a colored fellow—I don't know his name—a colored man, and another white man; I don't know him. Q. They were all laborers, like yourself? A. Yes, sir. . . .

Q. Just tell us, now, where these various men were working at the time you were hurt? A. Well, there were two of them loading rock in the box, and me and this other fellow (Dalton) were packing the building rock. Q. How far were these other two men from you? A. Well, they were something like about ten feet, I should judge. Q. Ten feet? A. Yes, sir. Q. Now, during the time that you had been working there—that is, from August—how many times had you requested the foreman, Mr. Forschee, to give you additional help? A. Well, that morning I asked him to give me help. Q. That was the first morning you had done that? A. Yes, sir. Q. You had worked there from August until December, but hadn't had occasion to ask Mr. Forschee for additional help until December 10th, the morning you were hurt? A. Yes, sir. Q. And during that time had you ever been assisted by more than one man in carrying rocks? A. Yes, sir. Q. How may times? A. Several times. When we would get in a bad place, we would double up on a rock. Q. Well, about how many times, would you say? A. Several times. I couldn't say just how many, because I don't know. . . . Q. Had you ever had occasion to assist other men carrying rocks? A. Yes, sir. Q. And how would you happen to assist the other men? A. Well, we would all double up and pack our rocks. If we would get hold of some we couldn't handle, we would ask them, and lay them up as good as we could. Q. You would lay them up as well as you could, and ask your fellow-laborers to help you, I suppose? A. Yes, sir. Q. What sized rocks did you handle down there in that quarry? How did they vary? A. I would judge they would weigh about three hundred pounds. Q. Were they all about alike? A. Yes, sir; something near the same (weight). Q. You don't remember having handled any larger than three hundred pounds, nor do you remember handling any smaller than three hundred pounds? A. No, sir; I don't. . . . Q. Now, I understood you to say that this 300-pound rock was more than you could carry—you and Dalton—is that right? A. It was, in the condition the place was in at the time. Q. Well, had you ever carried a 300-pound rock before, with Mr. Dalton? A. Yes, sir; on different places, dry places; yes, sir. Q. You could carry it all right on a dry place, could you? A. Yes, sir. Q. And how many times before had you carried 300-pound rocks with Dalton? A. I think it was the second day; I am not sure. Q. How many 300-pound rocks had you carried from the time you started, in August, until December? A. Well, I couldn't tell you how many I had carried. Q. Couldn't you give us some idea whether it was five or fifty? A. I couldn't tell you at all, because we were loading them out; I couldn't tell you how many. . . . Q. And these large rocks you handled with your hands? A. Yes, sir. Q. And you have gloves on when you are doing it? A. Yes, sir,

. . . Q. Now, do I understand you to say that that rock bottom was wet on that day? A. Yes, sir. Q. Had it rained the day before, or night before? A. Well, to my best recollection, it had. We had been knocked out six days on account of the high water. Q. What do you mean by high water? A. The water was up in the quarry, and they hadn't worked in it for six or seven days. Q. Was that due to rain, or to some other cause? A. Yes, sir; rain. Q. Your recollection is it had rained the night before? A. No, sir; I do not remember that. Q. You had worked the day before, hadn't you? ·A. I don't recollect if I had or not. . . . Q. What causes you to remember that the quarry was flooded? A. Because I was out there several times during that time to see when we were going to get to work, and when they were going to get the water out. Q. When you say the quarry was flooded, tell us what you mean. You mean the entire thing was submerged in water? A. It was all in water. Q. The bottom was under water? A. Yes, sir. Q. And how deep was the water? A. I would say, maybe, about three feet of water. Q. And that covered the entire bottom? A. Yes, sir. Q. When did you see that condition? A. Well, a few days before; I don't know just when it was. Q. Was it raining at the time you saw ·it? A. Yes, sir. Q. It was raining at the time you saw it, and you are sure that was within a week before you were hurt? A. Yes, sir; it was before I got hurt. . . . Q. Now, how many days did you work after the flood before you were hurt? A. The first·day, this was. Q. This was your first day? A. Yes, sir; to the best of my knowledge, this was the first day. . . . Q. And did any of the men start cleaning up the quarry? A. Yes, sir. Q. Who started to clean it up? A. Mr. Forschee. Q. He was the foreman, wasn't he? A. Yes, sir; he was cleaning up mud; he had a shovel, shoveling it back, and had a broom, sweeping it back. Q. And where did he put the stuff he shoveled. A. Against the wall. Q. And how far from where you were working was he? A. He was something like—over at the other side of the quarry. · Q. He didn't do any cleaning up around where you were? A. No, sir. Q. Had the water been completely drained from the bottom of the quarry when you started to work? A. Yes, sir. . . . Q. And then you went over to the north side (of the quarry), you and Dalton, and these two other fellows? A. Yes, sir. Q. Who told you to go over there? A. Mr. Forschee. Q. Where were you when he told you to go over there? A. On the south·side of the quarry. Q. Had he been there while you were working there (on the south side)? A. Yes, sir. Q. Now, when you went over to the north side of the quarry to work, did Forschee come with you? A. Yes, sir. Q. And when was it that you told him you thought it was too wet and muddy .for you to work there? A. That morning, about

10:30 o'clock, or something like that. Q. Where were you when you told him that; were you at the place that had been cleaned up, or at the muddy place? A. On the south side (of the quarry). Q. That was before you had gone over to the north side? A. Yes, sir. Q. How did you know the condition of the quarry on the north side? A. Because you could see it over there. Q. How far were the two places across? A. About ten or fifteen feet. Q. Only ten or fifteen feet from the north to the south side of the quarry? A. Yes, sir. . . . Q. And you went over there (to the north side of the quarry) with Dalton and started working? A. Yes, sir. Q. And one colored fellow and one white man went with you two? A. Yes, sir. Q. How many rocks did you carry? A. This was the first one. Q. Had you asked either the other white man, or the colored man, to help you carry the rock? A. No, sir. Q. On previous occasions, when you needed help, you asked your fellow-laborers to help you? A. Yes, sir. Q. Why didn't you ask them that morning? A. Because (foreman) Forschee told us to go ahead and pack them rock out; that two men was enough on them. Q. Are you sure that Forschee told you two men were enough? A. Yes, sir. Q. Had he ever told you two men were enough before? A. No, sir. Q. You had always been at liberty to call on each other when you needed help? A. Yes, sir. Q. And while you had worked there from August to December, this was the first time that Forschee ever told you that you couldn't have more than two men on a rock? A. Yes, sir. Q. That is right, isn't it? A. Yes, sir. Q. You are sure about that? A. Yes, sir. Q. How many occasions prior to that time had you asked your fellow-laborers to give you a lift, when you had an unusually heavy rock? A. Well, I asked them several times, when we got in a place where it was hard to handle the rock. Q. You would say, 'Give me a lift?' A. Yes, sir. Q. And they would always do it? A. Yes, sir. Q. And sometimes you were asked to give them a lift, and you would always do it? A. Yes, sir. Q. But, on this occasion, you didn't ask anybody to give you a lift? A. No, sir.. Q. Now, just tell us what you and Dalton were doing, that is, just immediately prior to the time you were hurt? Just describe, in your own words, how this accident happened. A. Me and Dalton were carrying building rocks out to the box, and I was walking backwards in the mud, and it was slippery and slick underfoot, and I was in such a strain from the rock that, when I slipped, the rock threw me backward, and the rock fell on my stomach. . . . Q. And you were walking south like this (illustrating), and Dalton was at the north, also walking south, and he was pushing the rock toward you (illustrating), was he? A. Yes, sir. Q. And this rock weighed about three hundred pounds, I understand you to say? A. Yes, sir. Q. Now, as you walked

backwards, how far did you proceed before your foot slipped? A. Something like two or three feet. Q. How many steps had you taken? A. I would say about three or four steps. Q. Now, while you were taking those three or four steps, did you look backwards to see the condition of the place where you were about to step? A. No, sir. Q. You didn't look backwards? A. No, sir. Q. So you didn't know on what you were stepping, did you? A. Sure, I knew I was stepping on the mud, but I had to walk back that way. I was strained with the rock. I couldn't look back to see where I was going. . . . Q. You are sure neither one of your feet struck any obstruction? A. Only the walk on the bottom. Q. Except the walk on which you were walking? A. Yes, sir. . . . Q. Which foot was it that slid? A. My left foot. My foot slipped out like that (illustrating). Q. Slid out forwards? A. Yes, sir. Q. You were facing north then? A. Yes, sir. Q. And when you slipped, where did you fall? A. Well, I fell on the rocks and on the mud. I fell on my back on the side of a rock. Q. And where did the rock rest? A. Right along on my stomach. Q. You were carrying this rock about at your belt? A. Yes, sir. Q. And when you slipped, the rock struck about on the belt—on which side? A. On my left side."

Bensone Dalton, called as a witness on behalf of defendant, testified, in substance, that he was working with plaintiff on the morning of December 10, 1925; that plaintiff and the witness were engaged in carrying flat rocks, which witness described as "good-sized rocks," about eighteen inches thick, two feet wide, and two and one-half feet long, the average weight of which rocks witness estimated at between 250 and 300 pounds; and that the witness and the plaintiff carried the rocks from ten to fifteen feet, from a pile of rocks to a wooden box, into which box the rocks were being loaded. Asked to described the condition of the floor of the quarry, where plaintiff and the witness were at work on the morning of plaintiff's injury, Dalton testified: "Well, it was kind of wet around there from thawing. There was some freeze around there that morning, but it wasn't so awfully wet, and it wasn't dry. The floor, where we were going in and out with this rock, you see, between those rock piles, it was kind of wet in there, you know, from us going in and out there; and other fellows were working there, you know. That is about the only condition that I can say about it—that it was kind of wet in there, from walking around. You know how it is in the winter time, that way, it is naturally sloppy. I didn't see any mud. The dust off of the rocks was wet around there." The witness, Dalton, testified further, as follows: "Q. And had you and Hulsey (plaintiff) carried rocks of this size before? A. Well, I don't remember if we had carried any that morning or not. Q. I mean, on numerous occasions, you had carried rock of that size and weight

before? A. Yes, sir. Q. And how many men usually handled rock of that size and weight? A. Well, we generally had been packing them by ourselves, two of us. Q. Just two (men); now, when you have a large-sized rock, and you want assistance, what was the custom to do? A. Well, you always ask somebody to help you. Q. When you asked somebody to help you, whom do you mean by 'somebody?' A. It don't make no difference—whoever was around close to you. Q. Laborers? A. Yes, sir. Q. Did you have to go to the foreman and ask him for help? A. I never did ask him. Q. Did anybody else, so far as you know? A. Hulsey (plaintiff) told me he asked him; I don't know. Q. When did he tell you that? A. He told me that when he came back from asking (foreman) Forschee; he said he asked for help, and then we goes to packing this rock and Hulsey fell. Q. Was that before or after he was hurt? A. Well, he told me this before he got hurt. Q. Did you ask other laborers to help you then? A. No, sir; I didn't ask nobody for help. Q. Why didn't you? A. I thought we could pack it ourselves. Q. How close was the closest man to you, outside of Hulsey? A. Well, they were probably five or ten feet away; they were out by the railroad track, and we were packing this rock about five or ten feet away. Q. Had you or Hulsey, as far as you know, ever gone to Forschee before to ask for help? A. I don't know as he did. I never did ask him. Q. You would always go back to the men and ask for help? A. Yes, sir. Q. Do you know why he (plaintiff) went to Forschee on this occasion? A. No, sir. Q. As you started to carry this rock, just describe what you did. A. Well, we rolls the rock out, so we could get ahold of it, and then we picked up the rock and started out with it, and coming through this aisle here—it is a kind of a narrow place—and Hulsey started out; he was walking backwards, and I was facing him. He was walking south—backwards—and I was going south, facing him, and I couldn't see his feet or nothing on the rocks, and I couldn't see if he slipped or how he went, but he went down in a hurry. I couldn't say how he went. I don't know if he slipped. I didn't look. After he fell, I helped him up. If he slipped, I didn't pay no attention to that. We hadn't gone very far, probably six or eight feet, something like that. When he fell, he fell on the side of this rock pile, and he sat down like—he sat down flat like, in a kind of a sitting position, and this rock pushed him backwards like. All the weight went down on him, for I was holding one end, and when he fell we let it go all the way, and it hit him in the stomach like. I couldn't say just where it hit him, and we raised the rock up then, so he could get out from under it. I held it on my knee, like that (illustrating), and he got out from under it. Q. Was the rock you were carrying on that occasion the usual size of rock? A. Well, they

were all sizes. Q. How did they vary? A. Well, the average size would be about one hundred and fifty pounds. Once in a while you would get a big one, like this one. Q. And you thought this one weighed about two hundred and fifty or three hundred pounds? A. Yes. Q. Did Hulsey (plaintiff) say why he had gone to Forschee and asked him for more help? A. He said they were too heavy. Q. You didn't hear him make a complaint to Forschee? A. No, sir; it was not within hearing distance. . . . Q. You say that Hulsey went over to where Forschee was, a short distance away, and came back and told you he had asked for more help, because he thought the rocks were too heavy? A. Yes, sir. Q. And that Forschee had refused to give him the additional help; is that the idea? A. Yes, sir.''

Joseph Forschee, called as a witness by defendant, testified that he was the foreman in charge of defendant's quarry at the time of plaintiff's injury; that the quarry had not been flooded in November or December, 1925; that the floor of the quarry was dry on the morning of plaintiff's injury; that plaintiff did not ask witness for additional help in moving the rocks on the morning of his injury, or complain to witness that the rocks were too heavy to be carried by two men; that it was customary for laborers in defendant's quarry to ask their fellow-laborers to help them, whenever additional help was needed; that witness examined the rock plaintiff was carrying at the time of his injury, and he ''judged'' its weight as about one hundred and fifty to two hundred pounds; that two men of ordinary size and strength could handle a rock of that size with safety, and that rocks of that size were handled by two men ''all the time'' in defendant's quarry; that plaintiff was employed, on an average, about three or four days a week, but sometimes plaintiff ''got a full week in;'' that the floor of the quarry where plaintiff fell was a solid, level floor, and there was no mud or dirt on the floor. The witness stated further that, whenever there was mud on the floor of the quarry, he would order the men to clean the mud off; ''when it was muddy they would clean it up.''

A number of physicians and surgeons testified on behalf of the respective parties, and there is a sharp and irreconcilable conflict in their testimony respecting the nature, extent and permanency of plaintiff's injuries. The testimony of plaintiff's medical witnesses was to the effect that plaintiff suffered an extremely painful and permanent injury to the lower spine, and to the sacroiliac joint, at the base of the spine, and that he suffered a permanent injury to the left pleura, or membranous covering of the left lung, which was diagnosed by plaintiff's medical witnesses as ''traumatic pleurisy.'' One of plaintiff's medical witnesses diagnosed plaintiff's injuries as being ''a twisting of the lumbar spine, with a tilting of the fifth lumbar vertebra on the sacrum, which is the wedge bone

in the back of the pelvis, and a widening of the left sacroiliac joint, and a downward tilting of the left pelvis." Another of plaintiff's witnesses diagnosed his injuries as being "traumatic pleurisy, probably rib fractures, and an injury to the left sacroiliac joint; a wrenching and straining of the sacroiliac joint." Several X-ray photographs were taken of plaintiff's lower spine, pelvis and sacroiliac joint. Plaintiff's medical witnesses interpreted the X-ray photographs as disclosing a displacement of the left lower vertebra, a widening and spreading of the left sacroiliac joint, and a displacement of the pubic bones, which injuries were attributed by plaintiff's medical witnesses to a trauma, such as plaintiff received when the heavy rock fell upon his abdomen. Defendant's medical witnesses, on the other hand, interpreted the X-ray photographs as indicating no traumatic injury whatsoever, except that such photographs evidenced an incomplete fracture, or "crack," of the tenth rib, which fracture had completely healed. Defendant's medical witnesses expressed the opinion that any irregularity or abnormality in plaintiff's pelvic bones was congenital, and was not the result of a traumatic injury.

Plaintiff testified that he had been unable to do any work since his injury, except such light work as feeding the stock on his father's farm, and that he had earned nothing since his injury. He testified further that he suffered continuous pain, and that he had been under the continuous care and treatment of a physician until the date of the trial of the instant action, which was one year and four months after his injury.

The appellant assigns error on the part of the trial court in the following respects: "(1) The court erred in admitting incompetent, irrelevant and immaterial evidence offered by the plaintiff; (2) the court erred in giving and reading to the jury Instruction No. 4, which instruction was given and read to the jury by the court at the instance and request of plaintiff; (3) the court erred in refusing to give and read to the jury Instruction No. 2, which instruction was offered by the defendant, and which defendant requested the court to give and read to the jury; (4) the court erred in giving and reading to the jury Instruction No. 5, which instruction was given and read to the jury by the court at the instance and request of plaintiff; and (5) the verdict and judgment are excessive."

It is noticeable that appellant, by its assignment of errors, does not urge, or make the point, that plaintiff did not make a submissible case upon the issue of defendant's actionable negligence, under the pleadings and upon the evidence adduced. In the absence (as here) of any assignment that plaintiff failed to make a case for the jury on the issue of defendant's negligence, the verdict of the jury upon that issue must be taken and accepted as conclusive and binding upon this court, and the judgment *nisi* must be affirmed, unless

the trial court committed reversible error in one or more of the five respects assigned by the appellant upon this appeal. We will accordingly discuss and rule the five assignments of error urged by appellant in the order as above stated.

I. Appellant urges that the trial court erred in permitting the plaintiff, Hulsey, to, testify that it was usual and customary for three or four men (and more than two men) to be used in defendant's quarry in carrying rocks of the weight and size of the particular rock that plaintiff and his fellow-workman, Dalton, were carrying at the time of plaintiff's injury. The assignment of error is predicated upon the following occurrence during the direct examination of plaintiff: "Q. How many men customarily are used to carry a rock *of that size* there? Defendant's counsel: We want to object to that question because there is no foundation laid for that question as to this man's qualifications to answer. He has not shown he possesses any knowledge, or technical knowledge, or experience in that line, as to how many men it would take, or what is customary in that line. The court: You may interrogate him further before I rule on that, Mr. Eagleton (addressing plaintiff's counsel). Q. You say you had been doing that class of work since August? A. Yes, sir. Q. And you had been working there for the defendant company? A. Yes, sir. Q. And had been carrying rocks of various sizes? A. Yes, sir. Q. Had you had occasion to see rock *of that same size* carried before, while working for the defendant there? A. No, sir. Q. Now, with that experience in mind, what would you say was the number of men ordinarily used by the defendant to carry *that sized rock?* Defendant's counsel: We renew our objection for the same reason. What he saw on one occasion would not bind us. He has not shown how many times he has seen rocks of that size carried, or under what circumstances, and we renew our objection for the same reasons as stated before. The court: I will overrule the objection. Defendant's counsel: We save an exception. Q. How many men ordinarily were used *in that class of work?* A. Well, sometimes three, and sometimes four, on a rock." (Italics our own.)

Appellant argues that, inasmuch as plaintiff had answered in the negative the specific inquiry, propounded to him by his counsel, "Had you had occasion to see rock *of that same size* carried before, while working for the defendant there?" by such negative answer plaintiff disqualified himself to testify respecting the number of men customarily and ordinarily used in defendant's quarry in carrying rocks of the weight and size of the rock that was carried by plaintiff and his fellow-workman, Dalton, at the time of plaintiff's injury. Appellant claims that plaintiff, by his negative answer to

the inquiry propounded by his counsel, palpably admitted that he did not know the number of men usually and customarily employed in defendant's quarry in carrying rocks of the same, or like, size and weight as characterized the particular rock that plaintiff and Dalton were carrying at the time of plaintiff's injury.

Respondent, on the other hand, contends that, notwithstanding plaintiff's negative answer to the specific inquiry propounded to him, yet his testimony, when viewed as a whole and in its entirety, clearly shows that plaintiff had had much experience in handling rocks of great size and weight, and that plaintiff's previous experience fully qualified him to speak upon the subject of the number of men ordinarily and customarily used in defendant's quarry in carrying rocks of a size and weight similar to that of the particular rock in the handling of which plaintiff was injured. Respondent futhermore asserts that it is obvious that plaintiff, in making a negative answer to the question propounded to him, whether he "had had occasion to see rock *of that same size* carried before, while working for the defendant there," must have misunderstood the question, and that other portions of his testimony clearly disclose that plaintiff, himself, had previously assisted other employees in carrying rocks of like size and weight, and that he had frequently observed other employees of defendant carrying rocks of like size and weight, and therefore it is unquestionable that plaintiff had actual knowledge, by reason of his prior experience and observations, of the number of men ordinarily and customarily used by defendant in carrying such heavy and large rocks.

The objection proffered by defendant's counsel was directed solely to the competency of plaintiff to testify as a witness, the objection being predicated upon what appellant asserts was an admission, made by plaintiff against his interest, to the effect that he had never "had occasion to see rock *of that same size* (as characterized the particular rock carried by plaintiff and Dalton on the morning of plaintiff's injury) carried before" in defendant's quarry. However, the subsequent testimony of plaintiff was to the effect that, during the period of his employment in defendant's quarry, he had frequently seen rock of the same size and weight carried by defendant's employees, and had himself assisted in the carrying and moving of rocks of like size and weight. It may be that the trial court should have sustained the objection to plaintiff's competency as a witness, at the time the objection was proffered, in which event the trial court doubtless would have permitted plaintiff's counsel to further interrogate the witness, in order to show his competency to speak upon the subject of inquiry. Nevertheless, plaintiff's subsequent testimony discloses that, prior to his injury, he had had occasion to observe rocks of like size and weight being carried and moved in defendant's quarry, and had himself assisted in carrying rocks of the same size

and weight. Therefore, the technical error (if such there be) in overruling defendant's objection to the competency of plaintiff as a witness, at the time such objection was proffered by defendant, was rendered harmless by plaintiff's subsequent testimony, which disclosed his personal knowledge and observation of the movement of rocks of like size and weight, thereby rendering him a competent witness to testify respecting the subject of inquiry.

"The general rule is that all persons who are capable of observing facts and of communicating their observations to others are competent witnesses . . . . A witness who is competent is properly allowed to testify to any evidentiary fact of which he has personal knowledge." [40 Cyc. 2192, 2193.] And, "where a witness's observation may enable him to form an estimate as to a certain matter, he is competent to testify as to his judgment in regard to such matter, although he disclaims positive knowledge." [40 Cyc. 2196.] Ordinarily, the competency of a witness is a question exclusively for the trial court, and not for the jury, and the admission or rejection of the witness (on the ground of his competency or incompetency) is a matter resting largely in the sound discretion of the trial court, and the ruling of the trial court upon the question of the witness's competency will not be disturbed on appeal unless such discretion is clearly abused. [40 Cyc. 2242, 2243.]

Viewing the testimony of plaintiff as a whole and in its entirety, we cannot say that plaintiff's testimony discloses that he was incompetent to testify respecting the subject of inquiry, and we find no such abuse of discretion on the part of the trial court as will convict the court of reversible error in allowing plaintiff to testify respecting his personal observations bearing upon the subject of inquiry. The appellant's assignment of error must be denied.

II. Appellant assigns error in the giving and reading to the jury of plaintiff's instruction numbered 4, which instruction was slightly modified by the trial court. The instruction, as modified and given to the jury by the trial court, reads as follows:

"The court instructs the jury that if you find and believe from the evidence that on the 10th day of December, 1925, plaintiff was in the employ of the defendant Tower Grove Quarry & Construction Company, and that while thus employed he was engaged in carrying and moving a large and heavy rock in and about the quarry of said defendant, and that while so engaged, if you do so find, the plaintiff did slip and fall and was injured thereby; and if you further find that the defendant did cause and permit mud, dirt and other substances to be and accumulate on the flooring of said quarry, and that said flooring was permitted to be and remain in a wet, slippery and slick condition and that by reason thereof said flooring was unsafe and dangerous and not reasonably safe, and that the aforesaid condition of said flooring, if you do so find, was known or

by the exercise of ordinary care on its part could have been known to the defendant in time, by the exercise of ordinary care, to have remedied said condition prior to plaintiff's injury, if you so find, and that said flooring was furnished and provided to the plaintiff in the aforesaid condition and that in thus providing said flooring under the circumstances aforesaid, if you do so find, the defendant failed to exercise ordinary care and was guilty of negligence, and that by reason thereof, if you so find, plaintiff's place of work was dangerous and not reasonably safe; and if you further find that in moving the aforesaid rock mentioned in evidence the plaintiff was not furnished or provided with a reasonably sufficient number of men to do said work with reasonable safety to the plaintiff, and that said defendant in failing to use a sufficient number of men, if you do so find, failed to exercise ordinary care and was guilty of negligence, and that plaintiff was injured as a direct result of the aforesaid acts of negligence on the part of the defendant (if you find and believe from the evidence that the defendant was guilty of negligence in failing to furnish a reasonably sufficient number of men to move the rock aforesaid, *if you do so find*, and in failing to furnish a reasonably safe place for the plaintiff to work, *if you do so find*, on account of said flooring being covered with mud, dirt and other substances, *if you do so find*, and being wet, slick and slippery as aforesaid, if you do so find) then your verdict will be in favor of the plaintiff and against the defendant." [The modification made by the court is denoted by italics.]

The foregoing instruction is attacked by appellant upon several grounds. The first ground of attack asserted by appellant is that the instruction "failed to require the jury to find that the defendant knew, or by the exercise of ordinary care could have known, that the number of men (two) engaged in carrying the rock (that occasioned plaintiff's injury) were insufficient to do said work with reasonable safety." It is noticeable that the instruction does require the jury to find, as a prerequisite to a verdict in favor of plaintiff, that the defendant, "in failing to use a sufficient number of men, if you do so find, failed to exercise ordinary care and was guilty of negligence." This court has repeatedly and uniformly ruled that a finding that defendant, under a hypothesized state of facts, therein failed to exercise ordinary care, and was guilty of negligence, is equivalent to a finding that defendant knew, or by the exercise of ordinary care could have known, of the existence of the hypothesized facts and conditions. [Messing v. Judge & Dolph Drug Co., 322 Mo. 901, 18 S. W. (2d) 408, 418; Berberet v. Amusement Co., 3 S. W. (2d) 1025, 1027; Morton v. Construction Co., 280 Mo. 360, 380; Midway National Bank & Trust Co. v. Davis, 288 Mo. 563, 575; Kamer v. Missouri-Kansas-Texas Railroad Co., 326 Mo. 792, 32 S. W. (2d) 1075.]

Speaking to the identical question, this Division of our court said, in the Messing case, supra (18 S. W. (2d) l. c. 418): "It has been repeatedly and consistently ruled by this court that a finding of *negligence* imports knowledge (on the part of the party found to have been negligent) of the unsafe condition of the appliance, or of the place of work. An allegation, or a finding, that a defendant *negligently* caused or permitted an unsafe described condition is equivalent to an allegation, or a finding, that the defendant *knew* the condition to exist. [Citing cases.] The reason for the foregoing uniform holding is readily apparent, for it is obvious that the jury could not well have found that the defendant was *negligent* in furnishing the plaintiff with an unsafe place in which to work without believing (and inferentially finding) that defendant knew, or by the exercise of ordinary care could have known, of the unsafe condition of the place of work."

Appellant complains that the instruction is unnecessarily repetitious in form and language, and that it emphasizes, accentuates, and gives undue prominence to the submitted issues respecting defendant's negligence; wherefore, it is claimed by appellant that the instruction is erroneous in form, was misleading and confusing to the jury, and was highly prejudicial to defendant. Doubtless, the instruction might have been drafted so as to have submitted the issues more concisely, and without repetition, but we do not believe that the giving of the instruction in its somewhat lengthy and repetitious form constitutes reversible error. Mere repetition in the giving of instructions to the jury is not ordinarily considered a ground for reversal of a judgment, unless pursued to such an extent as to amount to an unwarranted comment upon the weight of the evidence. [38 Cyc. 1681, 1682; Huss v. Bakery Co., 210 Mo. 44, 55.] We do not find that the criticised instruction amounts to a comment upon the weight of the evidence. The giving of similar instructions (which appear to have been more lengthy, and more repetitious in form and language, than the instruction herein complained against) has been held by this court not to amount to reversible error. [Wolfe v. Payne, 294 Mo. 170, 186; Choka v. Power Co., 303 Mo. 132, 145; Johnson v. Foundry Co., 259 S. W. 442, 444.] We do not find or believe that the instruction tended to confuse or mislead the jury. [Jackson v. Anderson, 273 S. W. 429, 431.]

It is claimed by appellant that the instruction *assumes* that defendant was guilty of negligence, in permitting the jury to find that "plaintiff was injured as a direct result *of the aforesaid acts of negligence* on the part of the defendant." The instruction, however, not only in its opening clauses, but again in the closing clause (which is enclosed in parentheses), specifically requires that the jury, before returning

a verdict for plaintiff, must find and believe (from the evidence adduced) each and all of the hypothesized facts and circumstances, constituting the submitted acts of negligence on the part of defendant, as charged in the petition. When the instruction is analyzed and viewed as a whole and in its entirety, it cannot be well said to assume negligence on defendant's part. [Jackson v. Anderson, 273 S. W. 429, 431; Agee v. Herring, 298 S. W. 250, 253; Balton v. Paper Co., 253 S. W. 433, 436; Liljegren v. United Rys. Co., 227 S. W. 925, 928.] The instruction clearly and properly required the jury, in arriving at a verdict, to find and believe all of the essential facts upon which the alleged and submitted negligence of defendant was hypothesized and predicated.

Appellant urges that there is no substantial evidence to support, or to warrant, the submission to the jury of the charge, or allegation, that "in moving the aforesaid rock mentioned in evidence, the plain-tiff was not furnished or provided (by defendant) with a reasonably sufficient number of men to do said work with reasonable safety to the plaintiff." Plaintiff testified, in substance, that it was customary and usual, in defendant's quarry, for three or four men to be used in carrying and moving a rock of the size and weight (320 pounds) mentioned in the evidence, whenever the floor of the quarry was in a wet, muddy and slippery condition. Appellant argues that three, four, or even more, men may have customarily been used by defendant in the class of work plaintiff was engaged in performing at the time of his injury, and under the same or similar conditions, and yet two men may have been all that were *reasonably required or necessary* to perform the same class of work, under similar circumstances and conditions, with reasonable safety to the men employed. In other words, appellant urges that the burden rested upon plaintiff to establish, by his evidence and proof, the number of men that are reasonably necessary in the performance of the work of carrying a rock weighing approximately 320 pounds, over a floor of defendant's quarry that is slick and slippery, and that plaintiff failed to sustain the burden so resting upon him by merely showing the number of men customarily and ordinarily used by defendant in the performance of such class of work. Hence, it is claimed by appellant that the instruction is broader than the evidence, and falls within the condemnation of the rule announced by this court in Degonia v. Railway Co., 224 Mo. 564, 589, which rule is to the effect that "an instruction cannot be broader than the pleadings, although the evidence may take a wider range; nor, on the other hand, can the instruction be broader than the facts proven, although the pleadings may take a broader range; in other words, the instruction must be within the purview both of the pleadings and the evidence;" and, unless the instruction measures up to, and squares with, the

rule so announced, the giving of such an instruction constitutes prejudicial and reversible error.

The applicable rule respecting the duty of the master toward his servant is thus aptly stated, in substance, in Haviland v. Railroad Co., 172 Mo. 106: The master owes his servant the duty to furnish him reasonably safe and suitable appliances for doing his work, and when the work requires men to do it, the men engaged therein are classed as appliances; and this implies that the master will employ a sufficient number of men to do the work required to be done with reasonable safety to the men engaged therein.

It is the well settled (and common-sense) rule that "negligence in the employment of an insufficient force (or number) of men for the work may be proved (either) by direct, or circumstantial evidence." [39 C. J. 1092, and cases there cited.] Thus, in Railway Co. v. Black, 157 Ky. 149, 150, wherein plaintiff sought to recover for personal injuries on the ground that defendant was negligent in not furnishing a sufficient number of men to carry a heavy barrel of paint, which barrel, according to the proof, weighed from 340 to 450 pounds, the Court of Appeals of Kentucky ruled that, when the size, weight and shape of the barrel was proven to the jury, and there was proof respecting the conditions and circumstances under which the barrel was to be carried, such circumstantial evidence was sufficient to enable the jury to intelligently judge and determine whether two men could carry the heavy barrel with reasonable safety. Said that court, in ruling the sufficiency of the evidence: "It is true he [plaintiff] introduced no evidence by any witness to the effect that two men could not safely carry such a barrel on such ground; but the nature of the ground and the nature of the package [barrel] were both fully shown to the jury by the evidence and the jury were practical men, and as qualified to determine when such a barrel could safely be carried by two men as any of the witnesses who were introduced on the trial."

In 39 Corpus Juris 1032, it is said: "It is competent to prove what is the usual method of work, either with defendant or others in the same business, under similar conditions, where such evidence has a tendency to show or disprove defendant's negligence or to contradict the contentions of the other party." In 39 Corpus Juris 1034, the applicable rule of evidence is thus stated: "Where an injury is alleged to have resulted from the master's failure to provide a sufficient number of men for the work, evidence is admissible to show the insufficiency of the force, and that defendant had notice of the fact. *The number of men customarily used by defendant on the particular work is admissible*, but the custom of other establishments is not admissible in the absence of evidence of similarity of conditions." [Italics our own.]

There was evidence in the instant cause that the particular rock, which plaintiff was carrying at the time of his injury, weighed approximately 320 pounds. There was further evidence (adduced by plaintiff) that the floor of the quarry, over which plaintiff and his co-worker, Dalton, were required to carry the heavy rock, was slick and slippery, and was covered with mud or dirt to the depth or thickness of two or three inches; that plaintiff complained to the defendant's foreman, Forschee, that the rock was too heavy for two men to carry, and asked Forschee for additional men to assist plaintiff and his co-worker, Dalton, in carrying the rock along and across the quarry floor; that the defendant's foreman, Forschee, denied plaintiff's request for additional help, and that the foreman stated to plaintiff that there was no danger to plaintiff in carrying the rock, and directed plaintiff to "go ahead and get those rock out." In addition to the aforestated evidence, plaintiff testified that it was customary for defendant to use three or four (and more than two) men in carrying and moving rocks similar in size and weight to the particular rock which occasioned plaintiff's injury, whenever the floor of the defendant's quarry was wet and muddy. Both plaintiff and his co-worker, Dalton, appeared before the jury as witnesses on the trial of plaintiff's action, and the jury were afforded the opportunity to judge of their size and strength, and of their physical ability to safely carry and move a rock of the size and weight of the rock in evidence, under the conditions appertaining to the place of work, as disclosed by the evidence. It is proper for the jury to draw all reasonable deductions and inferences from the evidence adduced on the trial. We think that there was substantial evidence, direct and circumstantial, from which the jury could intelligently find and determine that two men were an insufficient number to carry and move, with reasonable safety, the particular rock which occasioned plaintiff's injury, under the conditions and circumstances in evidence; and we find that there was ample and substantial evidence to warrant and support the submission to the jury of the question, or issue, whether defendant was negligent in failing to furnish "a reasonably sufficient number of men to do said work with reasonable safety to plaintiff." We are of the opinion that the instruction complained against by appellant is well within the purview both of the pleadings and the evidence, and that no error was committed by the trial court in the giving of such instruction.

III. Appellant assigns error in the trial court's refusal of defendant's requested Instruction No. 2, which was designed to withdraw from the consideration of the jury the specific charge or

allegation in plaintiff's petition that ''defendant negligently failed to exercise due care to furnish and use a sufficient number of men to do said work with reasonable safety when defendant knew, or by the exercise of due care could have known, that the number of men so engaged was insufficient to do said work with reasonable safety, and that it was dangerous and not reasonably safe.''

Appellant insists that there was no substantial evidence upon which to submit the aforequoted charge or allegation of negligence on the part of defendant. We have just ruled, in the immediately preceding paragraph of this opinion, that there is ample and substantial evidence upon which to submit to the jury such charge of defendant's negligence, and that plaintiff's Instruction No. 4 properly submitted such charge of negligence to the determination and finding of the jury. It follows therefrom that the trial court rightly refused the defendant's requested instruction numbered 2, which, if it had been given by the court, would have withdrawn from the consideration of the jury such charge of defendant's negligence.

IV. Appellant assigns error in the giving to the jury of plaintiff's Instruction No. 5, on the measure of damages. The instruction authorized the jury, in the event of a finding in favor of plaintiff, to ''allow him (plaintiff) such sum as you believe and find from the evidence will fairly and reasonably compensate him: (among other specified elements of damage) for such loss of earnings, if any, plaintiff has suffered by reason and on account of said injuries, if any, suffered on the occasion in question, not, however, to exceed the sum of $21.50 per week for such loss of earnings, if any.''

Appellant claims that there is no evidence that plaintiff was employed by defendant upon any weekly basis or stipend. Plaintiff testified that defendant was paying to him, at the time of his injury, a daily wage of $3.60; that sometimes he ''got in a full week of six days,'' and sometimes only two, or three, or four days in a week, depending upon prevailing weather conditions. There is no clear evidence respecting the average number of days per week that plaintiff actually worked during the total period of his employment by defendant, which period of employment extended from August until December 10, 1925. The mere mathematical calculation, however, shows that plaintiff's weekly earnings, whenever he ''got in a full week of six days,'' and computed upon a daily wage of $3.60, amounted to $21.60. The instruction complained against by appellant definitely limited plaintiff's recovery for loss of earnings to the sum of $21.50 per week, which sum is clearly within the evidence. Moreover, the instruction specifically directed the jury to allow plaintiff, in assessing his damages, such sum as the jury

shall "believe and find *from the evidence* will fairly and reasonably compensate him" for his loss of earnings. In the absence of a showing to the contrary, the jury must be presumed to have obeyed the directions of the instruction, and to have been governed by the evidence, and not to have made an allowance for loss of earnings in excess of the amount justified by the proof. [Huhn v. Ruprecht (Mo. Sup.), 2 S. W. (2d) 760, 763; Freese v. Wire & Iron Co. (Mo. Sup.), 274 S. W. 778, 780; Shinn v. United Railways Co., 248 Mo. 173, 182; Laycock v. United Railways Co., 290 Mo. 344, 356.] We find no reversible error in the giving of plaintiff's Instruction No. 5, on the measure of damages.

V. It is claimed by appellant that plaintiff's Instruction No. 5, on the measure of damages, is erroneous in that said instruction did not advise the jury as to the maximum amount which the jury might allow to plaintiff in assessing his damages. The assignment of error is somewhat unusual, in view of the fact that we are oft-times confronted with the claim and insistence that an instruction that specifies and fixes the maximum amount of damages which the jury may award by their verdict should be declared and held to be erroneous, because (it is often argued in this court) such an instruction impliedly invites the jury to award the full and entire pecuniary amount prayed by plaintiff in the petition. The plaintiff's Instruction No. 5, herein criticised, prescribed no limit upon the amount of damages recoverable by plaintiff, and fixed no maximum amount which the jury might award by their verdict.

The petition alleges that plaintiff's total damages aggregated the sum of $15,000, and prays recovery of that amount. The petition alleged, by way of special damage, that plaintiff had expended the sum of $300 for medical and surgical services and attention, and the sum of $200 for bandages, dressings, and X-ray photographs. No evidence was proffered by plaintiff to sustain the aforesaid allegations of special damage. The jury returned a general verdict, assessing plaintiff's damages at the sum of $15,000. The trial court ordered the plaintiff to remit from the verdict the sum of $3,500, which order plaintiff complied with by filing a *remittitur* in the amount required by the court.

Where the verdict is swollen by a definitely ascertainable and separable erroneous amount, as here, the false item of award may be eliminated by excision, under the established rulings in our jurisprudence, by requiring a *remittitur*. [Howell v. Jackson County, 262 Mo. 403, 420; Middendorf v. Schreiber, 150 Mo. App. 530, 536.] The *remittitur* of $3,500, ordered to be made by the trial court, and accordingly made by plaintiff in obedience to the court's

order, was more than sufficient in amount to eradicate the items of special damage, aggregating $500, for which plaintiff prayed recovery, but in support of which recovery plaintiff offered no evidence on the trial. The *remittitur* of $3,500, filed and entered by plaintiff, cured the error in the amount of the verdict, and the judgment (reduced by $3,500 after *remittitur* was made) is not reversible upon the ground of error in the amount of the verdict.

VI. Lastly, it is claimed by appellant that the verdict returned by the jury was so grossly excessive in amount as to disclose passion and prejudice on the part of the jury, and therefore defendant should have been awarded a new trial; and appellant furthermore urges that, notwithstanding the *remittitur* of $3,500 from the amount of the verdict, the amount ($11,500) of the judgment entered is still excessive.

We will not again undertake to recite the substance of the evidence bearing upon the nature, extent and permanency of plaintiff's injuries. A recitation of the substance of the evidence bearing upon the matter of plaintiff's injuries will be found in our statement of the evidentiary facts, supra. It may be conceded that there was a sharp conflict in the testimony of the medical witnesses proffered by plaintiff and defendant, respectively, on the matter of plaintiff's injuries. However, the jury, and the experienced trial judge, saw and heard plaintiff and his medical witnesses upon the witness stand, and are better able to judge of the nature, extent and permanency of plaintiff's injuries, and of the credibility of the witnesses, than are we, who have only the cold, printed record before us. If the testimony of plaintiff and his medical witnesses is to be believed (and the verdict evidences the fact that the jury believed their testimony), plaintiff suffered severe and permanent injuries, which wholly incapacitated him from performing such manual labor as he had theretofore been physically able to perform. There is no accurate, certain, or infallible guide to be followed by an appellate court in passing upon the matter of the excessiveness of an award for personal injuries. As this court has recently said, in Laughlin v. Railway Company, 275 Mo. 459, 472: "The most reliable rule for the guidance of an appellate court in determining whether a verdict is excessive is that, if the verdict is sustained by substantial evidence, it will not be disturbed unless the amount is such as to shock the judicial conscience, or there are (clear) indications that the jury was swayed by passion, prejudice, or in some way unduly influenced." The best that an appellate court can do in such cases is to exercise a sound and impartial judgment in considering whether the award is fair and reasonable under all the circumstances of the particular case.

Considering all the circumstances of the instant case, as disclosed by the record before us, we cannot say that the verdict of the jury was the result of passion or prejudice, or can we say that the amount ($11,500) of the judgment entered, after the filing of the *remittitur*, is excessive or beyond the bounds of reason. Manifestly, the judgment herein is supported by substantial evidence, and the amount of damages awarded thereby is comparable to awards (for similar, or like, injuries) which have been allowed by this court to stand undisturbed in other cases. [Northern v. Fisheries Co., 320 Mo. 1011; Manley v. Wells, 292 S. W. 67; Ruggeri v. Mfg. Co., 15 S. W. (2d) 775.]

Appellant, by its assignments of error, has directed our attention to no reversible error herein, and hence the judgment *nisi* must be affirmed. It is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.