ANTONIO RUGGERI v. MITCHELL CLAY MANUFACTURING COMPANY, Appellant.—15 S. W. (2d) 775.

Division One, March 29, 1929.

*Jones, Hocker, Sullivan & Angert* for appellant.

*Mark D. Eagleton* and *Hensley, Allen & Marsalek* for respondent.

RAGLAND, J.—This is a suit by an employee for personal injuries alleged to have been sustained through the negligence of his employer. Plaintiff recovered judgment in the circuit court for $15,000; from such judgment defendant prosecutes this appeal. Appellant concedes that the evidence was sufficient to take the case to the jury: it seeks reversal of the judgment on the grounds of error in giving instructions and excessiveness of the verdict. The statements of the facts by the appellant and respondent respectively are in substantial accord. As that of the respondent is somewhat more concise we adopt it:

"At the time of his injury plaintiff was employed in defendant's clay mine. He was injured by a large rock, weighing between two hundred and fifty and three hundred pounds, which fell from the roof of the mine and struck him on the back. Plaintiff had been employed in the mine between three and four months. Up until the day of the accident his work was that of a 'loader;' that is, he shoveled the clay into the cars. This clay was shot down from the face of the mine by another employee, called a 'digger.' On the day of the accident, the plaintiff took the place of the regular digger, who was at home sick, and plaintiff's brother, Ambrose Ruggeri, took plaintiff's job as loader or shoveler.

"The drift or entry in which plaintiff was working was seven feet in height and about the same distance in width. The method of bracing or cribbing generally followed in clay mining was employed in the mine in question, to sustain the sides and roof of the drifts or entries. Heavy oak timbers were set in upright position at each side of the drift and another timber laid across the top of the uprights. These timbers were fastened together with spikes. The 'sets,' as three timbers together were called, were placed within a foot or eighteen inches of each other. The timbers were approximately six inches by eight inches in dimension, and therefore a large proportion of the roof and sides of the mine was thus covered up. The cribbing or bracing extended up to the face of the mine, where the work of shooting out the clay was in progress. The evidence shows without dispute that there was available a sufficient supply of these timbers and that customarily it was one of the duties of the digger to place them in position.

"At the place where plaintiff was injured the vein or deposit of fire clay mined extended only about halfway down from the top or roof of the drift. Underneath this was a layer of worthless sandy clay.

"The upper four feet of the face of the mine disclosed the valuable fire clay, and the lower three feet, the sandy or worthless material. It was necessary to first shoot out and remove the upper layer of fire clay, and after this was done to take out the lower part, keeping the two separate. On the night before the accident the plaintiff had set five shots in what he referred to as the 'above;' that is, the upper layer of clay. The next morning, the day of the accident, this clay was loaded into the cars by plaintiff's brother, and it then became plaintiff's duty to shoot out the lower layer of sandy clay. The upper strata had been shot out to a depth of about five feet into the face of the mine. The sets of timbers had been installed up to the point where this work was in progress, and the witnesses agreed that it was impossible to install additional sets of timbers until the bottom layer of clay was removed.

"Plaintiff saw the rock which struck him in the exposed part of the mine roof, above the layer of sandy clay which was to be removed. He thought this roof was unsafe, and on this account he directed the attention of his foreman, Mr. Mariane, to it.

"The customary method of supporting a dangerous roof, where timber sets could not be used, was to place oak boards above the horizontal cross members of the cribbing and permit them to extend forward, so as to hold up the roof in advance of the point where the regular sets were in position. Testimony given on both sides of the case shows that this was the usual method of taking care of such a situation.

"When plaintiff called the foreman's attention to the roof, the foreman inspected it by tapping it with a pick. The foreman admitted that he discovered a seam in the rock; he did not know whether it was safe or unsafe, but said nothing to plaintiff about it. He stated that plaintiff at that time was working some distance back from this place and that he then ordered plaintiff to the face of the mine, to get out the lower layer of sandy clay.

"Plaintiff, on the other hand, testified that the foreman told him that the roof was safe enough, and that it would be unnecessary to put any boards up there to hold it. Plaintiff said: 'He [the foreman] told me it was safe enough, and I asked him if they could put boards up here, and he said "no," and they was ready to get the clay out and it was my duty to get it out.' The foreman told him there was no use in putting overhead boards at this place; he told plaintiff to go ahead and work, that this roof was safe.

"The plaintiff did not himself make any inspection of this rock in the roof of the mine. While the foreman was inspecting it, plaintiff was proceeding with his work, and upon being assured by the foreman that it was safe, the plaintiff believed him, and continued with his work. He was engaged in sinking a hole preparatory to blasting out the bottom layer of the drift, when suddenly the rock

fell and struck him, inflicting the injury for which the suit is brought.''

The facts relative to the nature and extent of plaintiff's injuries will be noted in connection with the consideration of the question of excessiveness of the verdict.

The assignments of negligence on which the plaintiff went to the jury were as follows:

''That said defendant did negligently and carelessly order, direct and require the plaintiff to work in the aforesaid mine under the conditions aforesaid [that the roof of the mine at the place where plaintiff was working was not properly braced or supported and by reason thereof was unsafe and dangerous], when it knew or by the exercise of ordinary care on its part could have known, that the roof of said mine and the parts thereof were not properly braced and supported.

''That defendant did negligently and carelessly assure plaintiff that it was reasonably safe for him to continue in said mine and did cause the plaintiff to rely on said assurances, when the defendant knew, or by the exercise of ordinary care on its part could have known, that the roof and the parts thereof were not properly braced or supported and by reason thereof the roof or parts thereof were likely to fall and injure the plaintiff.''

The instructions complained of were as follows:

''1. The court instructs the jury that if you find and believe from the evidence that the roof of the mine mentioned therein was unsafe and dangerous and not reasonably safe in that the roof was likely to fall and injure the plaintiff, if you do so find, and that said condition was known to said foreman, or by the exercise of ordinary care on the part of the foreman could have been known to said foreman, and that said foreman did thereafter, if you do so find, order and direct and require the plaintiff to work at the place where he was working at the time of injury, and in so ordering and directing the plaintiff as aforesaid, if you do so find, the said foreman did fail to exercise ordinary care and was guilty of negligence, and if you find that plaintiff was injured as a direct and proximate result of the aforesaid negligence on the part of said foreman (if you find from the evidence said foreman was guilty of negligence in ordering plaintiff to work under the conditions aforesaid (and that plaintiff was in the exercise of ordinary care for his own safety at all the times mentioned in evidence, then your verdict must be in favor of the plaintiff and against the defendant.

''2. The court instructs the jury that if you find and believe from the evidence that the roof of the mine mentioned therein was unsafe and dangerous and not reasonably safe in that it was likely to fall upon the plaintiff and that said condition, if you do so find, was known to the foreman or by the exercise of ordinary care would have

been known to him, and that notwithstanding said condition, if you do so find, the foreman did assure the plaintiff that it was reasonably safe for him to continue to work there in said mine and that plaintiff did rely upon said assurances, if you do so find, and if you further find that at all of the times mentioned in evidence plaintiff was in the exercise of ordinary care for his own safety and while relying upon said assurances, if you so find, was injured, and that the defendant's foreman was guilty of negligence in thus assuring the plaintiff, if you so find, that it was reasonably safe for him to continue to work there in said mine and that plaintiff was injured as a direct and proximate result of said negligence, if you so find, then your verdict must be in favor of the plaintiff and against the defendant.''

I. Appellant bases its attack upon the instructions set out above on three grounds: ''First, that they authorize findings which are broader than the evidence; second, that they omit to require the finding of elements indispensably essential to a recovery by plaintiff; . . . and, third, that the basic and underlying theory upon which the instructions are rested constitutes a departure from the theory of the petition . . . .''

(1) The first ground concretely put is this:

''The opening clause and basic premise of Instruction 1 reads as follows: '. . . If you find and believe from the evidence that the roof of the mine mentioned therein was unsafe and dangerous and not reasonably safe, in that the roof was likely to fall, etc.'

''Precisely the same language is employed in Instruction 2. . . . This language can only be construed as meaning that *every* part of the roof, and, therefore, *any* part of the roof, could be found by the jury to have been unsafe and dangerous. There is not, in the evidence, one scintilla of evidence that the entire roof was dangerous. On the contrary, it seems patent that every part of the mine, with the exception of the place where work was being conducted, was properly braced and rendered safe, and even that the braces in this mine were closer than in most mines. Every bit of evidence in the case as to danger in the condition of the roof referred to the small area thereof which overhangs the clay in which respondent was drilling holes. As to the remainder of the mine roof, there is not even the suggestion of danger. Each instruction should have been drafted so as to premise the dangerous condition of the *roof at the point where respondent was engaged in work* as the basis of his recovery. In premising the dangerous condition of the *roof of the mine* both instructions became broader than the evidence and were unsupported by the evidence.''

Appellant refutes its own contention. The instructions must be read in the light of the evidence; when so read, "roof of the mine" means "roof of the mine at the place where respondent was working." All of the evidence was directed to the roof of the mine at that particular place: there was no suggestion that it was dangerous at any other: it was concededly well supported and safe at every other. The instructions when construed in connection with the evidence were not broader than the evidence: the jury could not possibly have been misled by the language criticized.

(2) The second ground of challenge as we gather from appellant's argument rests on these premises: it was the duty primarily of respondent to inspect the roof of the mine and take such precautions as were necessary for his own safety; appellant would not therefore be liable for any neglect with reference thereto, unless it had interposed and taken those duties upon itself; and that the instructions did not require the jury to so find. But the first instruction did require the jury to find that defendant with knowledge, actual or constructive, of the condition of the roof of the mine ordered plaintiff to work under it: this specific order, if made, implied, as a matter of law, not only an assumption by defendant of the duty of determining whether or not the roof was safe, but an assurance by it that the roof was safe. [McGowan v. Railroad, 61 Mo. 528; Keegan v. Kavanaugh, 62 Mo. 230; Sullivan v. Railroad, 107 Mo. 66, 17 S. W. 748; Herdler v. Buck's Stove & Range Co., 136 Mo. 3, 37 S. W. 115; Bane v. Irwin, 172 Mo. 306, 72 S. W. 522; Haworth v. Telephone Co., 105 Mo. App. 161, 79 S. W. 727.] It was only necessary of course for the jury to find the facts; the implications of law flowing from them were for the court.

The express assurance of safety hypothesized in the second instruction likewise carried with it the legal implication that the defendant had assumed all duties in connection with the ascertainment of whether the roof of the mine was safe. [Authorities above.] What is here said has no reference to questions of contributory negligence or assumption of risk; but merely to a voluntary assumption by a master of a duty to his servant and its subsequent breach.

(3) Appellant's third ground of criticism is a composite of his first and second and is disposed of by what is said with respect to them.

II. "Relative to plaintiff's injuries, the testimony showed that plaintiff suffered a fracture of the fifth lumbar vertebra and a rupture of the bladder as an immediate result of the blow upon his back inflicted by the falling rock. He was confined in the hospital for six weeks. He underwent an operation, as a result of which the bladder was repaired. It was also discovered that the impact of the rock upon plaintiff's back had

forced the pubic bones somewhat apart, the right being slightly higher than the left pube, and that the sacroiliac joint was forced to be slightly separated to compensate for the irregular junction of the pubes in the front of the body. Plaintiff's complaints at the time of trial were inability to control his urine and his bowels, at times but not always, and a weakness in the lower part of his back, which inhibited the lifting of any weighty articles. At the time of the trial he wore a brace for his back. He had two scars on his abdomen from the operation and then walked with a slight limp. However, he was able to walk without any assistance and drove his own automobile.'' [Appellant's statement.]

It further appears that as a result of his injuries plaintiff suffers to some extent a loss of sensation and an atrophy of the muscles in the lower part of his back, and a general impairment of the nerves in that part of his body; that movements so far as the lower part of his back is concerned are limited; that the foregoing conditions are more or less permanent; and that he is totally and permanently incapacitated to perform manual labor. At the time of the trial he was twenty-nine years old; at the time he was hurt he was earning from $30 to $36 a week.

There is nothing in the record to indicate that the jury in the assessment of plaintiff's damages did not exercise an honest judgment: according to our precedents the amount is well within the limits allowable for such injuries. The contention that the verdict is excessive is disallowed.

The record disclosing no reversible error the judgment of the circuit court is affirmed. All concur.