RAY BRUNK v. HAMILTON-BROWN SHOE COMPANY, a Corporation, WILLIAM R. GENTRY, Receiver of HAMILTON-BROWN SHOE COMPANY and ROBERT DONEGHY, Appellants.—66 S. W. (2d) 903.

Division One, December 22, 1933.

518

*Allen, Moser & Marsalek* for appellants.

522

*Rieger & Rieger, Murrell & Murrell* and *Waldo Edwards* for respondent.

HYDE, C.—This is an action for damages for personal injuries. Plaintiff obtained judgment for $11,250, from which all the defendants have appealed. Plaintiff, a farmer, on Saturday evening, December 11, 1928, started from Kirksville on Highway 63 to his home near Millard, southeast of Kirksville. He was driving a wagon with sideboards on, pulled by a team of mares. His wife and children were in the wagon with him. He was carrying a common farm lantern on his left arm, lighted so that travelers upon the highway might distinguish him. A short distance south of Kirksville the left hind wheel of his wagon was struck by an automobile and broken down. His wife and children were taken home by a neighbor and plaintiff attempted to bring the wagon home, traveling on three wheels with the left hind hub dragging on the pavement. Plaintiff traveled in this manner to Millard without further mishap. The highway from Millard south was paved only with a nine-foot concrete strip along the west side, the east side being an oiled dirt road. There was a curve in the highway just south of Millard, but the highway ran southeasterly from that point, without a curve, for about a mile and a half. Plaintiff had proceeded about a half mile south from the curve, traveling on the concrete strip on the right side of the road, when he was run into by an automobile driven by defendant Doneghy.

Plaintiff testified that when he saw the lights of Doneghy's car approaching and realized that he was not going to turn out to the right, off the nine-foot concrete slab, he attempted to pull his team over onto the shoulder of the highway, but was struck before he was able to get completely off the pavement. One of the mares was badly injured and died in about a month, while the other had a hip "knocked down." Plaintiff's harness was badly torn up and his wagon completely demolished. Plaintiff was thrown out onto the

pavement, dragged by the team and injured. The driver of another automobile who saw the collision, caught the team and untangled plaintiff. This man and his wife, who also testified for plaintiff, said that Doneghy passed them a short distance south of the scene of the accident while they were going fifty miles per hour. They both said that they could see plaintiff's team and wagon by the lights of Doneghy's car and could also see the light of plaintiff's lantern. Doneghy said that he never saw plaintiff's light nor team and wagon until he hit them, and that they seemed to have risen right out of the pavement in front of him. He said he was watching the lights of some cars coming around the curve beyond, at Millard. He estimated that he was driving less than thirty-seven miles an hour because there was a vibration in his windshield that tinkled at that speed and he had not heard the tinkle.

Doneghy testified that the automobile, which he was driving, was owned by the Hamilton-Brown Shoe Company and it was admitted that it was furnished to him to use in his employment as a traveling salesman for the company. In that capacity Doneghy traveled over territory which included the counties of Macon and Adair, in which he was on the day of the accident, for the purpose of soliciting orders for shoes from merchants. Doneghy's headquarters were at Kirksville. The only evidence as to his use of the automobile on that date was his own testimony. He said he left Kirksville at three o'clock on the afternoon of the day of the accident, intending to go to Moberly to sell shoes to a merchant there for Hamilton-Brown; and that he stopped on the way at LaPlata to see a merchant there to sell him some shoes, but did not find him. He intended to try to sell him some close-outs, shoes with a special price on them, which he would be able to pick out when he went into St. Louis right after Christmas. He also said he might have been in another store in LaPlata at that time. He then went on to Macon and arrived there about five o'clock. When he got to Macon he decided he could not get to Moberly in time to find the man he had intended to see there, so after stopping for coffee and a cigar he started back to Kirksville. On the way back, he stopped at Atlanta, and called on two merchants there, one of whom he did not get to talk to because his store was full. He attempted to sell shoes to the other merchant at Atlanta but failed to get an order. Doneghy then drove back to LaPlata where he ate his supper at a restaurant. He said he got back to LaPlata about six o'clock and left there for Kirksville about seven. The accident occurred between seven and seven-thirty. While he was at LaPlata before he went to the restaurant he drove "down the road towards Love Lake, about three and one-half or four miles" with a man he met at LaPlata. Doneghy refused to say where he went after the accident. Defendants seem to appeal jointly and are all represented here by the same

counsel, although their arguments as to the alleged errors seem to apply mainly to the shoe company.

It appears that the Hamilton-Brown Shoe Company went into receivership in 1930, after this suit was filed but before trial. Plaintiff filed amended petition making the receiver a party defendant. The answer of the receiver set up his appointment by the United States District Court of the Eastern District of Missouri; that he was in charge of the company's property under the jurisdiction and direction of said court; and that "no permission to sue said receiver has been applied for or granted by said United States Court."

Defendants' first contention is that the judgment against the receiver is erroneous. Defendants say that leave was not obtained from the Federal Court, which appointed him, to bring suit against the receiver and that in any event the receiver was not liable for acts of the corporation prior to his appointment. Since plaintiff's suit was already pending before the receiver was appointed and since only judgment *in personam* against the shoe company was sought, it was not necessary for plaintiff to obtain permission to sue. [Hatch v. Morosco Holding Co. (C. C. A.), 19 Fed. (2d) 766; International & Great Northern Ry. Co. v. Adkins, 14 Fed. (2d) 149; Pine Lake Iron Co. v. LaFayette Car Works (C. C. A.), 53 Fed. 853; Mercantile Trust Co. v. Pittsburg & Western Railroad Co. (C. C. A.); 29 Fed. 732.] It has even been held that it is not necessary for a plaintiff, in a tort action seeking a judgment only to establish the corporation's liability, to ask permission to sue where the cause of action arose prior to the appointment of receivers, but that he could commence suit afterward against the corporation and it was then the duty for the receiver to appear to defend. [In re Seaboard Air Line Ry. (C. C. A.), 166 Fed. 376; see, also, 14A C. J. 988, sec. 3229; 53 C. J. 124, sec. 151.] [2] Plaintiff, therefore, had the right to proceed to judgment against defendant Hamilton-Brown Shoe Company. He did not, however, have a right to a judgment against the receiver. The corporation alone was liable and plaintiff had no cause of action against the receiver for the tort committed before he was appointed, nor to have execution issued against either the receiver or the company. [In re Seaboard Air Line Ry. (C. C. A.), 166 Fed. 376; Hatch v. Morosco Holding Co. (C. C. A.), 19 Fed. (2d) 766; Reed v. St. Louis-San Francisco Ry. Co., 277 Mo. 79, 209 S. W. 892; 14A C. J. 984, sec. 2225; 53 C. J. 131, sec. 160, p. 363, secs. 589, 590.] "The judgment of the State court is conclusive as to the amount of the debt, but the time and mode of its payment must be controlled by the court appointing the receiver." [Hatch v. Morosco Holding Co., supra, and cases cited.] The judgment must be reversed as to the receiver. "Where the interests of parties to an appeal may be rightfully severed, where the errors do not affect the parties jointly and where the rights of one party are not de-

pendent upon those of another, . . . judgment may be reversed as to one party and affirmed as to other parties." [Stotler v. C. & A. Ry. Co., 200 Mo. 107, 98 S. W. 509.] Any judgment against the Hamilton-Brown Shoe Company must be certified to the United States District Court for payment, unless the receivership has been terminated, in which case execution may issue against defendant, the Hamilton-Brown Shoe Company, as well as against the defendant Doneghy.

Defendants also contend that demurrer to the evidence as to the Hamilton-Brown Shoe Company should be sustained because it was shown that Doneghy was at the time of the accident and for some time before engaged in his own private affairs, that he had left the work of the company and had not returned to it. It is true that ''a master is liable for the acts of his employee only when the relation of master and servant is shown to exist, between the wrongdoer and the person sought to be charged with the result of a wrong, at the time of the injury and in respect of the very transaction out of which the injury arose." [36 C. J. 1268, sec. 256; Guthrie v. Holmes, 272 Mo. 215, 198 S. W. 854, Ann. Cas. 1918B, 1123; Miller v. Rice-Stix Dry Goods Co. (Mo. App.), 223 S. W. 437; Michael v. Pulliam (Mo. App.), 215 S. W. 763; Acker v. Koopman (Mo.), 50 S. W. (2d) 100.] Defendants' argument is that the last work Doneghy did for the company was at Atlanta and that thereafter he was not engaged in the company's business. It is true that he did not thereafter attempt to take any further orders for shoes, but his employment in his master's work did not cease the moment he went out of the last store there. He was employed to sell shoes over a large territory and was furnished an automobile to drive from his headquarters at Kirksville to other towns to solicit such orders. His hours of going and returning were fixed by his own convenience and the exigencies of the business. He was as much employed in his master's work in returning to Kirksville from interviewing merchants as he was in going out from Kirksville to see them. If he did not return in time for his evening meal he would not be deviating from his employment in stopping to eat. Cessation of work for eating, drinking and other like necessities are necessary incidents of employment and an employee so engaged does not sever his relation from his work nor does he do so by going to or from his places of work. ''Such activities or suspension of activity are necessary concomitants of the employment." [Milburn v. C., M., St. P. & Pac. Railroad Co., 331 Mo. 1171, 56 S. W. (2d) 80, and authorities cited.] So far as the evidence shows, and the only evidence was that of Doneghy himself (defendants say he was not put on the stand by them but he was questioned on direct examination by one of defendants' trial attorneys), he took, and was traveling at the time of the accident, the direct route from Atlanta, where he interviewed his last cus-

tomer, to his headquarters at Kirksville where he was, under his employment, expected to go. The only possible deviation shown was the short trip he took, before he ate his supper, south from LaPlata, the purpose of which he was not asked. While this may have been a deviation, if it was, he had returned to the route, which the return from his day's work for his company necessarily required him to travel, prior to the accident. We hold that the court correctly overruled defendant shoe company's demurrer to the evidence.

Defendants assign a number of procedural errors in the trial. They contend that it was error to permit the reading of plaintiff's petition to the jury. This court has condemned the practice of reading the pleadings to the jury. [Gorman v. St. Louis Merchants Bridge Term. Ry. Co., 325 Mo. 326, 28 S. W. (2d) 1023; Lewis v. Illinois Central Railroad Co. (Mo.), 50 S. W. (2d) 122.] Reading the pleadings to the jury is objectionable because they are addressed to the court, written in legal terms, and often cover more issues than are submitted to the jury. The issues which the jury must pass upon should be given to them by the written instructions of the court. In this case, there were no charges of negligence made in the petition which were not sustained by substantial evidence and the issues as to negligence were simple. Defendants say that the petition alleged more injuries than were proven and that it was, therefore, harmful to defendants to have these allegations read. However, the jury were referred to the evidence by the instructions for the determination of plaintiff's injuries and they undoubtedly would be more impressed by the testimony of the doctors' as to his injuries than by the allegations of the petition. Defendants could have offered cautionary instructions had they considered that the jury might have been misled by these allegations but did not see fit to do so. The court did, at their request, give an instruction on the burden of proof stating, among other things: "It does not devolve on the defendant to make proof of any fact; that burden must be borne by the plaintiff." It would only be where the pleadings contained something improper, which we could say would tend to confuse and mislead the jury to read them, or would have such a result because of other unusual circumstances, that it could be reversible error. We do not think that is true in this case.

Defendants also contend that it was error to give plaintiff's Instruction C, which was as follows:

"The court instructs the jury that if you find for the plaintiff in this case you cannot find against the defendant Hamilton-Brown Shoe Company and its receiver, W. R. Gentry, unless you also find against the defendant Robert Doneghy. If you find for Robert Doneghy in this case you cannot find against the defendants Hamilton-Brown Shoe Company and its receiver, W. R. Gentry."

Defendants do not contend that this instruction incorrectly stated

the law, but argue that "it could not have failed to confuse and mislead the jury and give them an entirely erroneous impression as to their province in the case," especially since plaintiff had no instruction covering the whole case. Defendants are in no position to object to the manner of submission because they did not make an objection to this submission nor request the court to require instructions on the charges of negligence, nor themselves offer any instruction on the question of agency or deviation from the employer's work. [Freeman v. Berberich, 332 Mo. 831, 60 S. W. (2d) 393; Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950.] Instead, defendants pitched their battle solely upon negligence and contributory negligence, seeking to exonerate Doneghy as well as themselves by showing that plaintiff was negligent in failing to carry a light and properly handle his team. If it can be said that plaintiff's instruction in any way implied that the shoe company was liable for Doneghy's acts by ignoring the agency issue the same thing can be said of defendants' instructions. In view of the evidence, they obtained a very favorable submission on the issue of contributory negligence. It would even likely seem to the jury, from their instructions, that plaintiff had the burden of proving his own care. Having failed to weather the storm on negligence, the defendant shoe company may, on this appeal, throw Doneghy overboard as a Jonah, but it cannot by now doing so escape the consequences of having carried his burden and lost, at the trial, on those issues. Plaintiffs' instruction does not direct a verdict against any defendant, but only amounts to a statement that if the liability of Doneghy is not established there can be no liability on the part of his employer. This is good law and if the defendants thought that the jury needed further information upon the subject they should have supplied it.

Defendants also object to Instruction B, which gave the jury a form of verdict. This instruction supplied a form to be used "if you find for the plaintiff against the defendants." The form stated: "We, the jury, find for the plaintiff and against all the defendants." Defendants say that this would mislead the jury and tend to cause them to believe that if they found for plaintiff they must find against all the defendants. However, defendants requested an instruction, which was given, providing forms for finding for each of the defendants separately and for all of them. If the jury decided in favor of the defendant shoe company there was a form for them to follow in preparing their verdict. While, perhaps, the instructions as to the form of verdict, offered by both parties, could have been improved upon, we see nothing in them which would mislead the jury. If defendants did not see fit to provide a form for every possible combination of findings it was another consequence of their efforts to exonerate Doneghy.

Defendants also complain of the fact that, when the jury stated to the court that they did not understand the part of the instruction about the form of verdict which stated that the verdict should be written on a separate sheet of paper, the court said:

"You must prepare the separate sheet or I will have the attorneys on either side prepare a blank form for you to sign. . . . Whichever form you wish to use, just copy it. I don't think you will have any difficulty about that. If you do, come in and indicate it and we will prepare the forms."

The court also explained to them they should not fill in a form in their instructions because, if they did so, it would appear as though the court had directed the jury to find that kind of a verdict. We find nothing improper or prejudicial in the court's explanation of this matter and, as above stated, the jury had before it a form for finding in favor of each defendant separately and all of them together. Defendants did not seek to take advantage of the court's suggestion that the attorneys prepare blank forms for the jury to use.

Defendants also object to the reading of certain parts of Doneghy's deposition without reading it all. The court instructed the jury of its own motion that what was read from the deposition could only be considered upon the question of Doneghy's liability and was not binding upon the other defendants. The parts read related to Doneghy's movements, including the interviewing of merchants to get orders for shoes, on the date of the accident. He testified to substantially the same matters when questioned by defendants' counsel, and upon cross-examination without any objection, after he took the stand, so that this could not have been prejudicial.

Defendants also complain of the introduction in evidence as hearsay of a statement of account tending to show that the shoe company traded the automobile, which Doneghy was driving, as part payment for a new car after the accident. This evidence only tended to show that the shoe company owned the car which struck plaintiff. It was admitted that they furnished Doneghy the kind of a car the account showed was traded in, and he testified that he was driving their car. This error was harmless, since there was no real dispute about ownership.

Defendants also complain (on the ground that no such injuries were alleged) of the testimony of Dr. Wolf that plaintiff developed neuralgia of certain nerves and suffered a nervous shock. Defendants made no objection until after Dr. Wolf had testified concerning these matters and did not ask the court to strike it out. There is, therefore, nothing preserved for review. The trial court cannot be convicted of error concerning a matter upon which it was not asked to make a ruling. [Wolfson v. Cohen (Mo.), 55 S. W. (2d) 677; and cases cited.]

532

Defendants further claim that Instruction B on the measure of damages was error. This instruction was as follows:

"The court instructs the jury that if you find for the plaintiff against the defendants you shall assess plaintiff's damages against defendants at such sum as you believe from the evidence will reasonably compensate him for such damage and injuries as plaintiff has received, if any, to his team, wagon and harness, and such damages and injuries to his person and body, if any, not to exceed the sum of $25,500."

As to the part of this instruction relating to plaintiff's personal injuries it is contended that it does not limit the allowance to fair and reasonable compensation; that it does not confine the jury to a consideration of the injuries sustained as the result of the collision, and that it is too general. While the requirement that the jury assess the damages at such sum as will reasonably compensate plaintiff appears before the clause relating to property damages and is not repeated thereafter, still we think that it clearly refers to all the damages thereafter authorized and that the jury would so understand it. All of the instructions given on behalf of the defendants on the issue of contributory negligence, as well as this one, referred merely to plaintiff's injuries and did not specifically mention the collision. There was no evidence that plaintiff was ever injured at any other time and the jury, by this and all the other instructions, were required to make their findings from the evidence in the case. A similar contention was made and overruled in Cunningham v. Doe Run Lead Co. (Mo.), 26 S. W. (2d) 957, and Thompson v. Q., O. & K. C. Railroad Co. (Mo.), 18 S. W. (2d) 401.

The criticism that this kind of an instruction was too general and therefore gave the jury a roving commission was made and overruled by this court in Greenwell v. C., M. & St. P. Ry. Co. (Mo.), 224 S. W. 404 (a personal injury case in which a *remittitur* was ordered). The instruction in that case merely told the jury that "in assessing plaintiff's damages you may allow him such sum as you believe from the evidence is the proper cash value of such damages as you believe will reasonably compensate him for the injuries, if any, sustained by him." This court there said:

"It is argued that this instruction is entirely general, and does not point out to the jury the elements which they might consider in estimating the plaintiff's damages. The defendant asked no instruction directing the jury how to estimate damages, if any, which the plaintiff suffered. The instruction given for plaintiff was entirely correct in the general statement presented, and if the defendant desired to direct the jury more particularly as to the elements they should consider in estimating the damages, it was the privilege of the defendant to ask such instruction."

Similar general instructions have been approved. [Waddell v.

Metropolitan Street Ry. Co., 213 Mo. 8, 111 S. W. 542; Smith v. Fordyce, 190 Mo. 1, 88 S. W. 679; West v. St. Louis Southwestern Ry. Co., 187 Mo. 351, 86 S. W. 140; Strayer v. Q., O. & K. C. Ry. Co., 170 Mo. App. 514, 156 S. W. 732; Wilson v. St. Louis & San Francisco Ry. Co., 160 Mo. App. 649, 142 S. W. 775; Wheeler v. Bowles, 163 Mo. 398, 63 S. W. 675; see, also, Hurst v. C., B. & Q. Railroad Co., 280 Mo. 566, 219 S. W. 566; Hoover v. St. Louis Electric Term. Ry. Co. (Mo.), 227 S. W. 77; Keyes v. C., B. & Q. Railroad Co., 326 Mo. 236, 31 S. W. (2d) 50; Meyers v. Atlas Portland Cement Co. (Mo. App.), 260 S. W. 778; Steinkamp v. Chamberlain Co. (Mo. App.), 294 S. W. 762.] These authorities, and many others cited therein, hold that an instruction on the measure of damages in a personal injury case is not erroneous because it is general if it does not misstate the law and that if defendant considers it might be misleading it is his duty and right at the time "to request an instruction advising the jury in more explicit language respecting the measure of plaintiff's damage, or otherwise limiting the amount of his recovery, or specifically excluding from the consideration of the jury such facts and circumstances in evidence as defendant deemed inapplicable and irrelevant to a determination of the amount of recovery." [Keyes v. C., B. & Q. Railroad Co., supra.] Similar general instructions have been approved in wrongful death cases. [Browning v. Wabash Western Ry. Co., 124 Mo. 55, 27 S. W. 644; Powell v. Union Pac. Railroad Co., 255 Mo. 420, 164 S. W. 628; Morton v. Southwest Telephone & Telegraph Co., 280 Mo. 360, 217 S. W. 831; Koehler v. Wells, 323 Mo. 892, 20 S. W. (2d) 31; Menard v. Goltra, 328 Mo. 368, 40 S. W. (2d) 1053; Sing v. St. L.-S. F. Ry. Co., 30 S. W. (2d) 37.] ▇ Damages for personal injuries, like damages in wrongful death cases, cannot be computed by any exact mathematical calculation, rule or formula and, while certain elements may be called to the attention of the jury so as to aid them, after all the ultimate test is what will fairly and reasonably compensate a plaintiff for his injuries, and this is necessarily very largely within the discretion of the jury. It would seem that the instruction in this case might in fact be more favorable than unfavorable to defendants upon the issue of damages for personal injuries. It limited plaintiff's damages to "injuries to his person and body." It might have specifically included pain and suffering, both past and future, loss of time, doctors' bills and hospital expenses.

As to personal property damage, however, there is a definite rule for calculation, to-wit: The difference between the reasonable market value before and after injury; and the jury should be so informed. [Badgley v. City of St. Louis, 149 Mo. 122, 50 S. W. 817; Streett v. Laumeier, 34 Mo. 469; Pannell v. Allen, 160 Mo. App. 714, 142 S. W. 482; Smith v. C., R. I. & P. Ry. Co., 183 Mo. App. 180, 170 S. W. 324; Jackels v. Kansas City Rys. Co. (Mo. App.), 231

S. W. 1023.] There may be also other elements, such as expense of treatment or preservation, but damages to personal property can be determined with much greater accuracy and within much narrower limits than damages for personal injuries. Defendants' contention that the proper rule for determining damages to personal property should be given to the jury is correct. We also find that there is no evidence of the value of plaintiff's wagon and none even describing it so that the jury could value it. The evidence as to value and damages as to the rest of plaintiff's personal property was rather indefinite. We do not think, however, that a reversal of the entire judgment is required as defendants contend. Plaintiff sued for $25,500. Plaintiff's petition did not separate the damages asked for personal property from those asked for his injuries, but plaintiff's attorney in his argument to the jury, preserved in the record, pleaded for a judgment of $25,000, on account of plaintiff's injuries. It would, therefore, seem apparent that plaintiff was suing for $500 for damages to his personal property. The evidence, as to the value of the team and harness, does not show a total value of over $175, and is therefore sufficient to show that the total value of all the personal property could not, even if the value of a new wagon was added thereto, exceed $500 (see 23 C. J. 166, sec. 1993; Moore v. Michaelson (Wis.), 140 N. W. 28); and there was no evidence or suggestion as to expense of treatment or any other elements that could be considered in connection with personal property damage. Even if the jury thought, from the indefinite instruction on the measure of damages, that they should award plaintiff the full value of this property or what it would cost to completely replace it including a new wagon, it is not conceivable that they could assess a greater amount than $500. We can therefore say from the evidence with reasonable certainty that if plaintiff is required to remit that amount, no part of the remaining judgment will contain any award for personal property damage, and also that the full amount plaintiff sued for on account of such damage has been remitted. It will be so ordered.

 Defendants further complain of the argument of plaintiff's counsel. The part of this argument, set out in defendants' brief as objectionable, is as follows:

"If you would permit Doneghy to escape and find for him, and then find against the shoe company and the receiver, the verdict isn't worth the paper it is written on, and that boy would never get a penny, so if you want him to have anything, if you think he is entitled to it, then find against all three of these defendants and we will collect the judgment."

Defendants' argument upon this proposition is similar to that concerning the instruction to the effect that the defendant shoe company could not be held liable unless the jury also found against

Doneghy, namely, that it tended to induce the jury to bring in a verdict against the shoe company without first finding that it was responsible for Doneghy's acts. The argument might have been improper insofar as it would tend to convey the idea that the jury should find against the shoe company merely to make a collectible judgment. However, it was qualified by "if you think he is entitled to it." Upon objection by defendants and a request that this argument be stricken, plaintiff's counsel consented that it might be withdrawn and the court instructed the jury that it was stricken out and that they should not be influenced by it. Plaintiff's counsel did not persist in the matter further. The defendants pursued the same course as to this argument that they did in connection with the instruction on this proposition. They did not answer the argument of plaintiff's counsel and explain to the jury the facts which would be necessary to make the shoe company liable for Doneghy's acts, or point out the facts in evidence which they thought would relieve them of liability therefor, but submitted the case without any argument on their part. We hold that there was no reversible error in the court's action in overruling their request to discharge the jury.

 Defendants' final contention is that the verdict is excessive for the injuries plaintiff received. They contend that no permanent injuries were shown. Plaintiff was thrown violently upon the pavement and dragged by his team. His hip and spine were injured, and he received injuries to his left shoulder and other bruises. He also testified that it hurt his lungs and kidneys; that he spit blood most of the winter; that he passed blood in his urine for a longer period; and that his kidneys had not functioned normally since then. He said that ever since the accident he had had a severe pain in his spine that goes down in his right leg and that he could not sleep at all some nights because of the severe pain in his back, especially if he took much exercise. While he walked to his home after the accident, about two miles, he said he was in a dazed condition and that thereafter he had to walk with a crutch or cane; that he had been unable to do any work since the accident; and that he was still being treated for his injuries. The trial was more than two years after the accident and it was shown that plaintiff had left his farm and moved to Kirksville where his wife was running a rooming house. At the time of the trial, plaintiff was forty-one years old and the evidence was that prior to the accident he was a strong, robust man who did all kinds of farm work. Three doctors who treated him testified in his behalf and two doctors who saw him testified for the defendants. One of plaintiff's doctors described his injuries as follows:

"I found a displacement of the outer end of the clavicle or collar bone of the left side; considerable injury to the soft tissues around the left shoulder; I found an injury in the region of the second and

third cervical vertebrae; I found that the second, third and fourth left ribs were badly twisted; the right hip bone was considerably displaced, not dislocated, but displaced in the sacro-iliac articular; I also found that the pelvis was twisted on the last vertebra of the spine; in other words, an injury to the sacro lumbar articular; I found that all the spinal muscles had suffered severe bruising and sprain; this was due to the fact most of this injury that Mr. Brunk had received, the fall on his hip and shoulders, particularly the left shoulder; Mr. Brunk, at the time of coming to my office, nine days after the injury, had developed a very severe case of neuralgia of the right leg; neuralgia of the left arm; of the nerves in the left arm; he had neuralgia of the second, third and fourth intercostal nerves; this was due to the fact that these ribs had been clamped together or subluxated, resulting in an impingement of the second, third and fourth intercostal nerves.''

As to the permanency of these injuries this doctor said that his shoulder injury was not permanent, but further said as to the injury to the hip and spine:

''According to my best experience in the injuries suffered by Mr. Brunk, they are very likely to be a permanent disability, regardless of your treatment. . . . The outcome to a case in an injury of this kind does depend greatly, however, on the treatment that is given the case and the general constitutional condition of the patient at the time of the injury.''

The first doctor plaintiff went to, the day after the accident, testified as defendants' witness and said that he gave him a general examination without an X-ray; that he thought there was nothing seriously wrong, it seemed to be all bruises and strain; that he had the appearance of being stiff and sore all over and that there was a certain amount of limitation of motion, but that he thought it would clear up in a short time. He did not see him again. The other doctor who testified for defendant took an X-ray of plaintiff's pelvis at the request of one of plaintiff's doctors. He said he saw no evidence of a fracture of any pelvic bones and that the picture showed the pelvic bones in normal position. Plaintiff's doctor, who had this X-ray taken, however, said that this doctor at the time the X-ray was taken thought there was a fracture of either the lower lumbar vertebrae or the sacrum. Plaintiff's doctor said there was such a fracture and also an injury to the sciatic nerve. This doctor gave plaintiff numerous electrical treatments, but when he discovered this condition he said he told plaintiff he could not do him any good.

The doctor who treated plaintiff throughout the greater part of the time before the trial said that plaintiff's shoulder injury was better and that he did not expect a permanent injury to that area. He said, however, that the injury in the sacroiliac region retarded

the movement of plaintiff's right leg and that the movements were about one-third of normal. As to the permanency of this injury, which he described in a similar way to that hereinabove quoted, he said: "Yes, sir, we would expect a permanent injury in this specific case from those injuries described." He said that the condition caused by the pelvic injury did not improve under his treatment. We think that this evidence with reasonable certainty tended to show permanent results so that the jury was justified in finding from it, in connection with evidence as to the violence with which plaintiff was struck and thrown upon the pavement, that plaintiff had suffered a permanent disabling injury to the joint, spine and nerves in the sacroiliac region which will prevent him from earning a living for himself and family as a farmer. While a verdict of $10,750 is very substantial, we cannot say it is excessive, since it is not out of line with other cases where there were similar disabling injuries, involving the sacroiliac region. [Keehn v. D. R. F. Investment Co., 328 Mo. 1031, 43 S. W. (2d) 416; Hulsey v. Tower Grove Quarry Co., 326 Mo. 194, 30 S. W. (2d) 1018; Rockenstein v. Rogers, 326 Mo. 468, 31 S. W. (2d) 792; Ruggeri v. Mitchell Clay Mfg. Co., 322 Mo. 737, 15 S. W. (2d) 775; Fowlkes v. Fleming, 322 Mo. 718, 17 S. W. (2d) 511; Richardson v. K. C. Rys. Co., 288 Mo. 258, 231 S. W. 938; Zichler v. St. Louis Pub. Service Co., 332 Mo. 902, 59 S. W. (2d) 654; Jamison v. Flour City Ornamental Iron Co. (Mo.), 30 S. W. (2d) 984; Rockenstein v. Rogers, 326 Mo. 468, 31 S. W. (2d) 792; Gately v. St. L.-S. F. Ry. Co., 332 Mo. 1, 56 S. W. (2d) 54.]

The judgment is reversed as to defendant W. R. Gentry, Receiver, and will be affirmed against defendant Robert Doneghy and Hamilton-Brown Shoe Company on condition plaintiff file within ten days a *remittitur* of $500, as of the date of judgment, otherwise, the judgment will be reversed and remanded as to these defendants. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.