THOMAS J. BRADY v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—127 S. W. (2d) 1.

Court en Banc, April 4, 1939.

*Walter N. Davis* for appellant.

*Mark D. Eagleton* for respondent.

ELLISON, J.—Owing to a defective handhold, or grab iron in railroad parlance, the respondent fell from the top of a freight car to the ground in the yard of the Wabash Railway Company in Granite City, Illinois, and was injured on November 20, 1927. The car had been placed on an interchange track in the yard by the appellant Terminal Railroad Association for delivery to the Wabash and respondent first sued the latter for his injuries and recovered a judgment for $25,000 in the circuit court. But that judgment was reversed outright by Division One of this court in April, 1932. [Brady v. Wabash Ry. Co., 329 Mo. 1123, 49 S. W. (2d) 24, 83 A. L. R. 655.] During the pendency of that suit he also filed the present action against the appellant, which came to trial in November, 1933, and respondent again recovered judgment, this time for $15,000. On appeal this court en banc reversed that judgment in February, 1937. [Brady v. Terminal Railroad Assn., 340 Mo. 841, 102 S. W. (2d) 903.] Respondent obtained a writ of certiorari from the United States Supreme Court, which reversed our decision on January 31, 1938, and

remanded the cause to this court for further proceedings. [Brady v. Terminal Railroad Assn., 303 U. S. 10, 82 L. Ed. 614, 58 Sup. Ct. 426.] The case was reargued at the present September Term, 1938, this time on the sole issue whether the $15,000 damages awarded were excessive. We limit our statement to the facts on that issue, taking most of them bodily from appellant's brief without quotation marks.

Respondent was 31 years old when injured. He testified that he landed on his back when he fell. About a half hour afterward he was taken to the Granite City Hospital. He said he remained there for two or three weeks, but the hospital records show he was discharged six days after the accident. They bandaged his back and treated his left hip where it was cut, bruised and had been rubbed by the cinders. Beginning three or four days after he returned home, for possibly a month or two he was taken back and forth to the office, where he remained for several hours. He was still being treated by the Wabash doctor at Granite City. He suffered pain every day in the middle of his back. His hips were bruised and he had trouble getting up and down, and used a cane. While at the Wabash office he was not required to do any work. He made no improvement at all while under the care of the Wabash doctor, and got worse all the time.

He then went to see Dr. Meinhardt, who treated his back electrically and massaged it. At the time of the accident he weighed 155 pounds. At one time thereafter he weighed 115 pounds. In the summer of 1929 he went to western Texas and remained a year and a half. Up to that time he had not worked. Since the accident he had worked about fifteen days on a vegetable truck, but his back hurt and he became nervous. He has worn all the time a brace composed of canvas and leather strips. He had no difficulty or pain or inconvenience or discomfort of any kind in his back or any other part of his body before the accident, and worked seven days a week for the Wabash. He has made efforts to go without his cane for two or three days at a time but finds he cannot get along without it. He gets jerky, makes quick steps and cannot get around well. At the time of the trial, six years after the injury, he was suffering pain under his shoulder blades, in the middle of the back and down close to the hips. Recently, Dr. Meinhardt has given his back electrical treatments.

Dr. Meinhardt said the respondent first consulted him in the early part of January, 1928. At that time he had a large amount of tenderness over the entire back extending from the lower part of the shoulders down to the hips, and the muscles of those regions were tender on pressure or palpation; the muscles were rigid and somewhat tender and boardlike. He was very nervous. At that time he weighed 145 to 150 pounds and he complained of headaches, pain in both hips, inability to stoop or bend over, and his back became worse when he moved around. The treatment prescribed was rest to sort of immobilize the spine, and heat to the back. His muscles also were given

massage. He was given liniment for his hips and sedatives to promote rest and sleep. His back was taped with adhesive from below the shoulders to the hip region. It was kept on for one, two or three months. A supportive belt was suggested and respondent has worn two or three while under the doctor's care. In 1929 X-ray pictures were taken, but they were not produced at the trial because they had been misplaced and lost during a former trial.

The doctor's diagnosis was a hypertrophic arthritis of the spine. He explained that means an abnormal bony growth projecting from the edges of the bones. In this instance it was growing between the vertebrae. The doctor was waiting for this condition to become solid and there is not much that can be done for appellant medically. The doctor expects the bones to become fused or ankylosed. This condition exists between the 10th and 11th vertebrae, corresponding to the 10th and 11th ribs, and located about the middle of the back. The spine ankylates backward in this region. He has a curvature of the spine to the left which is congenital, that is, the curvature has come on because of the stiffness of the spine. An arthritic condition shown by X-ray photographs taken two weeks after the injury would be too soon to say that it was due to the injury. The doctor found increased arthritic deposits between the 10th and 11th vertebrae, since he began his treatment of respondent. Respondent had an arthritic condition which antedates the injury, but since the injury the X-rays show the projection bone has increased. In the doctor's opinion respondent's fall rekindled or lighted up the condition and caused this additional bony growth and the pain. The condition is very painful. Plaintff has a disability with respect to manual work because of the pain and after that he will have a disability because of the back being stiff.

On cross-examination, Dr. Meinhardt said respondent at present weighs 150 pounds and that he can work, depending upon the kind of work, and that there are some types that he should be able to do. He does not think respondent is as agile as he was previously. Even with pain a man can do things. Respondent has no broken bones that the doctor found. The X-ray pictures taken by him on January 17, 1928, showed a condition of some bony growth in the lumbar region. The ankylosis now is between the 10th and 11th thoracic vertebrae, two vertebrae above the part that the doctor X-rayed in January, 1928. This is in the lower part of the back and the chest and the doctor never did take an X-ray of the thoracic vertebrae. Of his own knowledge the doctor does not know there is an ankylosis condition, except from the other X-ray pictures taken by a Dr. Peden. He did not know whether the condition was there previously. The spurs lower down on the spine and disclosed by Dr. Meinhardt's own X-ray pictures, may be a result of the condition existing. He X-rayed respondent three times, but he never X-rayed the place of this ankylosed condition. The original arthritis was due to a diseased condition and

it must have existed before the injury. The X-rays did not show any broken bones. The bone growth of the upper lumbar region that respondent had could not occur in a week or two. . From history of the patient, the doctor believed that the injury was lighting up or aggravating the condition. The part of the back that the doctor X-rayed showed a hyperthropic arthritis with which the accident of November 27, 1927, had nothing to do. Respondent complained to the doctor only of his back and hips and headaches. He did not complain of falling on his head or tell the doctor that he had lit on his head.

. Doctor Peden, an X-ray expert, and witness for respondent, testified that he made X-ray pictures of respondent's spine and back on February 19, 1929. The X-ray pictures showed a slight amount of hypertrophic changes with a slight new bone projection on the 11th thoracic vertebra. Instead of the bone being rounded, as it normally should be, it comes to a point. On October 3, 1932, the doctor took another X-ray of respondent. On the 12th thoracic vertebra there was a definite increase in the bony projection, and in addition, between the 10th and 11th there is almost complete fusion. The two points have practically grown together and are attempting to form a union between the bones. The outgrowth on the lower margin of the 11th thoracic is definitely greater and longer, and in addition to that the upper 10th has a little projection that he was unable to see in the 1929 pictures. Pictures taken a year later in October, 1933, showed the growth on the lower right side of the 11th thoracic vertebra had very definitely increased in the last year before the trial. The doctor did not take the X-ray pictures for treatment.

On taking the first X-ray pictures Dr. Peden could not see anything in the way of fractures or dislocations, or anything of that sort. The 11th thoracic was the one that really was the most involved. Respondent's lumbar spine was comparatively normal. Hypertrophic arthritis of the spine may be due to infection or injury or changes in the glandular system, such as the thyroid and pituitary and other glands of the body or metabolism, the building or the tearing down of the tissues, or disease. It takes hypertrophic arthritis six months at the earliest to show in an X-ray examination following a definite cause. The doctor did not know whether the conditions found in the X-ray photographs existed or not before November 20, 1927, nor do the X-rays tell him that.

Respondent's witness Dr. Pernoud, first examined him on February 29, 1929. He found his whole spine from his neck to his hips more or less rigid, the spine movements carefully guarded and the range of motion of the spine inhibited and less than normal. There was a tenderness on pressure around the spine all the way along and the loin muscles were dense (tense?) and drawn tighter than normally, which the doctors call muscle cord. The whole medical picture was what is called arthritis of the spine. He did not have plaintiff under observa-

tion for the purpose of treating him. He examined him on October 3, 1932, and found the previous conditions existing. He also found a slight lateral curvature of the spine which was due to an increased pull of the muscles on one side and not to any malformation of the spine, as he saw it.

On the first examination respondent complained of pain in his left hip, which had subsided. He had no complaint about his hips, but was wearing a supporting belt, and it appeared the line (loin?) muscles were more rigid upon his examination on October 6, 1933, than in either of his two previous examinations. Plaintiff could not go up and down ladders on cars or move with agility on stepping or bending because of the pain that would be produced and the stiffening of his back. If he did this for any period at all the pain would become so excruciating that he might even faint or fall because of the shock. In the future he will still continue to suffer pain. It was the doctor's opinion the condition is permanent and that the active process will continue. He thought the violence of the spine activity was reinflamed, that is, that it re-enacted the arthritis of the spine.

On cross-examination the witness said respondent could drive an automobile for certain periods of time, but not from day to day, or even a whole day except at the expense of considerable pain. Even though the X-ray shows only part of the vertebrae are affected, clinical knowledge justifies the opinion that others are inflamed. He could not do work of strong physical labor, lifting or that activity. He might work for considerable periods of time, but he could not do any job of labor that would entail 8 hours' work day by day. The doctor was of the opinion that the respondent was suffering severe pain on the three occasions when he saw him, in February, 1929, October, 1932, and October, 1933, as shown by the tension of the muscles. Continuing the doctor said that many cases of arthritis are the result of injury, but that the greater number are caused by disease. He would presume plaintiff's original arthritis was due to a diseased condition. It could have happened from metabolism or infection. A person can have arthritic deposits on his spine without suffering pain if the deposits are very small. Trauma usually lights up an infection. The doctor believes plaintiff's condition of November 20, 1927, was aggravated by his injury that day. He had no opinion as to the cause of the original arthritis. However, he had no way of knowing how long the condition that he found in February, 1929, as to the 10th, 11th and 12th thoracic vertebrae had been there. The doctor said in answering questions he took into consideration every thing possible with the history included, including the history of brothers and sisters. He said he could express the opinion that the activating of the arthritis started at that one time—namely the time when respondent began to experience pain after falling from the freight car in November, 1927.

For the defense Dr. Will testified that he first examined respondent on February 18, 1929. At that time he found no gross abnormalities about the back except that respondent was slightly stooped. His spine moved in all normal directions. There were no definite fixed points, there were no palpable bony abnormalities, no definite points of localized tenderness. But the respondent complained of discomfort in the lumbar region. The clinical tests were made to their normal extent with no back pain and no evidence of lumbar muscle spasms. The movements of the lower extremities were accomplished in the normal fashion, that is, outward, upward and backward and were accomplished to normal and were hyper-tests of the extremities. They failed to elicit any spasm in the back. Respondent was wearing a body jacket on this visit. The X-ray examination showed some hypertrophic changes to the upper margin of the 4th lumbar vertebra, also in the region of the 4th dorsal high up in the back. These changes had been there possibly for a year, probably several years, but at least longer than six, eight, ten or twelve months. There were no objective findings to account for a tenderness on pressure over the back of the head. The condition of his back would not account for it. He found nothing in his examination with respect to his hips or lower extremities by way of objective signs of injury, that is, there was no swelling or atrophy or limitation of motion or any physical findings that he could put his finger on, nothing we call objective findings. He found no muscle spasms.

The doctor again examined respondent on September 26, 1933. On the first examination he had weighed 125 pounds and on this second visit 153 pounds. He was carrying a cane and limping. He still showed the slightly stooped position, and was wearing a body jacket. Putting him through the various clinical tests that he had gone through before, the doctor was unable to find any definite clinical evidence of a back injury, that is, there was no spasm or anything to point to any definite injury to the back, though respondent complained of tenderness on light touch or palpation throughout the entire dorsal or lumbar spine. The doctor found respondent's hips normal, that is, he found nothing in the way of injury or disease or any evidence of any fracture or bone deformity. The respondent complained of headaches but there were no objective findings about his scalp or skull. He also complained of his hips. There was nothing visible there.

The X-ray pictures Dr. Will took in September, 1933, showed a normal spine. They do, however, disclose two small hypertrophic spurs on the lower margin of the 11th dorsal, more pronounced on the right side than on the left. The doctor found no reason for respondent's wearing a truss. The 10th and 12th vertebrae were normal though one might say the upper margin of the tenth on the right side may be a little sharp, but the doctor didn't believe in it

enough to say there was any hypertrophic change in it. However the witness, Dr. Will, admitted that Dr. Peden's pictures showed hypertrophic changes on the lower margin of the 11th dorsal vertebra, on the upper margin of the 10th and a small spur on the lower margin of the 9th. He could not see any growth on the 12th. And he said Dr. Peden takes a lot of pictures for him (Wills). He could see no evidence of ankylosis, and could find nothing in respondent's physical or X-ray examinations to account for any inability to work. The doctor thought respondent could work as a car inspector and climb up cars. The hypertrophic spurs were, in his opinion, due to the man's age and particular type of occupation. Prior to age 30 they are fairly rare and they are uncommon in men between 30 and 40 years of age. The respondent as stated was thirty-one when he fell. The doctor did not believe the fall caused the hypertrophic spurs. If the spurs were not there on September 12, 1929, the fall did not cause them in his opinion.

In the margin* we have summarized fifteen recent decisions of this court dealing with the size of the verdict where spinal and back

---

*15 Am. Jur., sec. 223, p. 649; 17 C. J., secs. 416, 417, pp. 1097-8; L. R. A. 1915 F, p. 446, note; 46 A. L. R., p. 1255, note; 102 A. L. R., p. 1167, note.

Westenhaver v. St. L.-S. F. Ry. Co. (1937), 340 Mo. 511, 519, 102 S. W. (2d) 661, 665. Age 57. Unemployed railroad engineer. Injury to brain and vision; coccyx and sacroiliac. Verdict for $15,000 affirmed.

Cole v. Uhlmann Grain Co. (1937), 340 Mo. 277, 300, 100 S. W. (2d) 311, 323. Age 45. Earnings $33 per week. Permanent and progressive brain injury, and sacroiliac sprain. $35,000 reduced to $25,000.

Tate v. Western Union Tel. Co. (1936), 339 Mo. 262, 267, et seq., 96 S. W. (2d) 364, 367. Age 39. Housewife. Electric shock, nerve and back injury. Verdict $25,000 reduced by *remittitur* in circuit court to $17,500 and further enforced *remittitur* in the Supreme Court to $12,500.

Kelso v. Ross Construction Co. (1935), 337 Mo. 202, 227, 85 S. W. (2d) 527, 541. Age 45. Earnings $35 per week. Pelvis tilted, sacroiliac injury. $15,000 reduced to $11,000.

Carpenter v. Wabash Ry. Co. (1934), 335 Mo. 130, 137-8, 71 S. W. (2d) 1071, 1075. Age —. Railroad construction laborer. Coccyx fractured, aggravation of arthritis in 4th and 5th lumbar vertebrae. $15,000 reduced to $10,000.

Plater v. K. C. (1934), 334 Mo. 842, 850, 68 S. W. (2d) 800, 804. Age 20. Earnings $20 per week, telephone operator. Permanent injury to back, nervousness causing pain and ill health. $10,000 verdict affirmed.

Brunk v. Hamilton-Brown Shoe Co. (1933), 334 Mo. 517, 535, 6 S. W. (2d) 903, 910. Age 39. Farmer. Injury to vertebrae, 3 ribs, hip bone, pelvis, spine and sacroiliac. $10,750 damages sustained.

Zichler v. St. L. Pub. Serv. Co. (1933), 332 Mo. 902, 916, 59 S. W. (2d) 654, 659. Age 39. Earnings $40 per week. Injury and arthritis of spine and sacroiliac joint. $15,000 cut to $10,000.

Gately v. St. L.-S. F. Ry. Co. (1932), 332 Mo. 1, 11, 56 S. W. (2d) 54, 58. Age 38. Railroad boiler washer, salary $125 to $130 per month. Sacroiliac injury. $20,000 verdict affirmed.

Porter v. C. B. & Q. Rd. Co. (1930), 325 Mo. 381, 389, 28 S. W. (2d) 1035, 1039. Age 60. Earnings $200 per month. Trauma causing permanent injury to spinal cord affecting speech and walking. Severe pain. Plaintiff died pending appeal. $10,000 verdict sustained.

Clayton v. Wells (1929), 324 Mo. 1176, 1190, 26 S. W. (2d) 969, 974. Age 17. Manual laborer. Bad fracture of 3rd lumbar vertebra, ankylosis of three vertebrae. $20,000 cut by trial court to $16,000; latter sustained.

injuries were involved. Added to the list are ten late cases from other states and general citations. The respondent here suffered no fractures, paralysis or long hospitalization. He has experienced pain, worn a canvas jacket or corset and has some spinal curvature. According to the testimony of the physicians who testified in his behalf,

Messing v. Judge & Dolph Drug Co. (1929), 322 Mo. 901, 927, 18 S. W. (2d) 408, 419. Age 35. Earnings $15 per week. Injury of 4th lumbar vertebra with abscess causing necrosis destroying bone and resulting in rigidity of spine. $25,000 reduced by trial court to $18,000 and the latter affirmed.

Ruggeri v. Mitchell Clay Mfg. Co. (1928), 322 Mo. 737, 745, 15 S. W. (2d) 775, 778. Age 29. Earnings $30 to $36 per week. Fracture of 5th lumbar vertebra, sacroiliac injury and rupture of bladder. $15,000 verdict affirmed.

Mount v. Western Coal & Mining Co. (1922), 294 Mo. 603, 614, 242 S. W. 943, 946. Age 31. Earnings $5 per day, fracture of 11th and 12th dorsal vertebrae impinging on nerves. $20,000 cut to $15,000.

Page v. Payne (1921), 293 Mo. 600, 611, 625, 240 S. W. 159, 163. Age 35. Earnings $160 per month. Traumatic neuritis affecting nerves of lumbar vertebrae and sacro region. $20,000 cut to $12,500.

Dept. of Water & Power of City of Los Angeles v. Anderson (C. C. A. 9th Cir. 1938), 95 Fed. (2d) 577. Age 26. Earnings $8 per day. Comminuted fracture 1st lumbar vertebra. Ankylosed with vertebrae next above and below. Verdict $21,904 affirmed.

Robbins v. Weatherwax (1935), 283 N. Y. Supp. 170. Age 62. Earnings $24 to $36 per week. Fracture of transverse process 2nd and 3rd lumbar vertebrae, with aggravation of arthritis in lower dorsal and lumbar spine. Verdict for $12,500 set aside by trial court; reinstated by Appellate Division, 2 out of 5 judges dissenting.

McNeil v. East Bay Street Rys. Co. (1934), 220 Cal. 591, 600, 32 Pac. (2d) 598, 602. Age and earnings not shown. Broken back. Vertebrae did not knit necessitating wearing of steel brace. A prior spinal arthritis lighted up. Sacroiliac and nerve injury. Verdict for $35,761 upheld.

Safety Motor Transit Co. v. Cunningham (1933), 161 Va. 356, 171 S. E. 432. Age 36. Housewife. Spinal traumatic arthritis superinduced or precipitated by injury and producing semi-invalidism. Verdict for $15,000 called large but affirmed.

Scurlock v. Peglow (1933), 263 Mich. 658, 249 N. W. 35. Age 47. Earnings reduced $80 to $90 per month. Fracture of one or more lumbar vertebrae, necessitating encasement in plaster cast for three weeks and permanently causing pain.

Gray v. Briggs (1932), 259 Mich. 440, 243 N. W. 254. Age not shown. Earnings "at times" $40 per day. Fracture of 2 or 3 cervical vertebrae causing temporary paralysis of left arm and leg. Left foot still drags. Partial permanent disability. Verdict of $12,250 affirmed.

The New Zealand (E. D. N. Y. 1931), 49 Fed. (2d) 781. Age not shown. Earning power of $140 per month seriously impaired. Compression fracture of 11th dorsal vertebra, causing permanent partial disability and necessitating wearing of steel spinal brace or corset. Verdict of $12,500 awarded.

Dean v. Koolish (1931), 212 Iowa, 238, 234 N. W. 179. Crushing of 8th dorsal vertebrae. Long hospitalization, permanent partial disability of physician and surgeon, substantially reducing his earnings. Verdict of $13,419.15 held not excessive.

Rowe v. Rennick (1931), 112 Cal. App. 576, 297 Pac. 603. Age 26. Housewife. Fracture of coccyx and of the lamina of lower lumbar vertebrae. Affecting functioning of rectum and preventing normal childbirth. Wears steel brace. Verdict for $10,800 upheld.

Perry v. McLaughlin (1931), 212 Cal. 1, 14, 297 Pac. 554, 560. Age 40. Earnings $16 to $18 per week. Fracture of 11th vertebrae which had previously been affected with smouldering tuberculosis. Pain and prolonged hospitalization. Wears steel brace, permanently disabled to do any hard work. Verdict for $12,500 upheld.

510

he is permanently disabled from following his former work as a railroad car inspector, but there are lighter kinds of employment that he can go into. Considering everything we think his injuries are not as serious as those shown in most of the cases cited.

But respondent was only thirty-one years old and was earning $175 per month or $2100 per year when he was hurt. In that respect he was more fortunate than the plaintiffs in most of the cases cited. He had not worked for six years, when the case was tried below. That alone would represent a loss of over $12,000. He was thirty-seven years old when the case was tried and according to the American Experience Tables then had an expectancy of 30.35 years. Respondent's brief assumes he would have continued in his former employment for that full time, and estimates his future earnings at $63,735, which, commuted to their cash value at the time of the trial under the annuity table in Section 3132, Revised Statutes 1929 (Mo. Stat. Ann., p. 5174), would amount to $25,943.40. This would be in addition to the $12,000 wages lost up to the time of the trial, his $520 outlay for medical attention and his pain and suffering. If we figure more conservatively and say he would have worked only until he was sixty years old (if he actually lived that long) the present value of his earnings would be only $22,777.02. But, as stated, respondent is not incapacitated from doing some kinds of work, and by application thereto he should be able to reduce his future damages. If cases such as Kelso v. Ross Construction Co., Carpenter v. Wabash Ry. Co., and Zichler v. St. L. Pub. Serv. Co., cited in the margin, are to be considered as controlling, perhaps the verdict in this case is too big.. But it will be noticed the award in many of the cases exceeded $12,000, where the earning power of the plaintiff was not as great as here. We cannot give a demonstrable reason for reducing the judgment, and the same is therefore affirmed. All concur.